IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ACT, INC., | : |
| | : |
| | : Case No. 3:18-cv-00186-TRM-HBG |
| Plaintiff and Counter-Defendant, | : |
| | : |
| v. | : |
| | : |
| WORLDWIDE INTERACTIVE NETWORK, INC. and Teresa Chasteen, | : |
| | : |
| Defendants and Counter-Claimants. | : |
| | : |
| | : |
| | : JURY TRIAL DEMANDED |
| | : |
| | : |
| | : |
| | : |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF AND COUNTER-DEFENDANT ACT, INC.'S DAUBERT MOTION TO EXCLUDE DEFENDANT AND COUNTER-CLAIMANT WORLDWIDE INTERACTIVE NETWORK, INC.'S ANTITRUST DAMAGES EXPERT TESTIMONY OF GEORGE S. FORD, PHD**

**REDACTED**

I.  INTRODUCTION

WIN devotes large swaths of its opposition brief to attacking straw men. WIN writes at length about Dr. Ford's educational background, the fact that "statistics" is a "widely-accepted scientific field," and the fact that various factual disputes unrelated to this motion are "issues for the jury." But when it comes to the actual grounds for this *Daubert* motion, WIN does not have very much to say. WIN concedes that neither of its antitrust experts did *anything* to analyze the issue of causation—an essential subject of expert analysis under Section 2 of the Sherman Act. WIN concedes that Dr. Ford simply *assumed* that causation is satisfied—*i.e.*, that ACT's supposed unlawful conduct is the *only* reason WIN could have lost or been prevented from bidding on *any* contract—and that Dr. Ford did not consider any other potential cause for WIN's claimed damages. And WIN does not even acknowledge the many cases holding that Dr. Ford's assumptions about causation are categorically improper under *Daubert*.

Nor does WIN come close to justifying (1) its attempt to further inflate Dr. Ford's damages calculations by serving yet another untimely "supplemental" expert report adding more supposed damages, and (2) Dr. Ford's invitation to the jury to speculate, based on nothing but his say-so, that damages are even higher—by some unknown amount—than the figures set forth in any of his many reports. This is exactly the kind of prejudicial gamesmanship the federal expert disclosure rules exist to prevent. For all of these reasons, Dr. Ford's baseless damages opinion must be excluded under *Daubert* and Rule 702.

I.  **DR. FORD'S DAMAGES OPINION IS INADMISSIBLE UNDER *DAUBERT* BECAUSE HE UNDISPUTEDLY FAILED TO ANALYZE THE ISSUE OF CAUSATION.**

Dr. Ford's entire purported antitrust damages analysis is based on a single overarching assumption about causation: *i.e.*, that the *only reason* WIN could have failed to win *any* contract

in the proposed relevant market was ACT's allegedly unlawful anticompetitive conduct. WIN's opposition brief confirms that Dr. Ford conducted *no analysis* to determine whether *any other factor* could have caused WIN to lose any contract—despite clear, undisputed evidence in the record that other relevant factors exist.

This is not, as WIN would have it, an issue for the jury to decide. Indeed, WIN does not even acknowledge the authorities holding that, to survive *Daubert*, an antitrust expert must *actually address* alternative causes of the claimant's alleged damages and *explain* why he is dismissing those other causes. (*See* Dkt. 301 at 19-20) (collecting authorities.) It is undisputed that Dr. Ford did not do this. Both of WIN's antitrust experts confirm that they offer no opinion on causation whatsoever. (Dkt. 309-01, Ex. DD at 223:2-16; *id.*, Ex. CC at 342:4-15.)

WIN misidentifies the issue when it contends that Dr. Ford is permitted to assume "that ACT has engaged in exclusionary conduct." (Opp. at 12.) That is not the assumption being challenged here. Dr. Ford did not merely assume that ACT engaged in the conduct WIN alleges, he assumed that this alleged conduct is *the only possible cause* of WIN's claimed damages, without first analyzing other potential causes and explaining why they do not apply. That crucial "analytical leap," which completely sidesteps the essential element of causation under Section 2 of the Sherman Act, is what is categorically improper under the *Daubert* case law. *See Davids v. Novartis Pharms. Corp.*, 857 F. Supp. 2d 267, 278 (E.D.N.Y. 2012) (an expert must "address obvious alternative causes and provide a reasonable explanation for dismissing specific alternative factors . . . ."); *see also Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 920 (6th Cir. 2009) ("The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted

injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation.").

There are many *undisputed* examples in the factual record of reasons why WIN could have lost a bid, or been precluded from bidding entirely, that have nothing whatsoever to do with any alleged unlawful conduct by ACT. It is undisputed that Dr. Ford did not consider a single one of them, much less explain why it was appropriate to disregard them.

*First*, and perhaps most glaring: as WIN itself testified under oath, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,[1] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*) How can an antitrust expert testify that his client suffered antitrust damages by being deprived of an opportunity to bid on a contract, when ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Second*, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



---

[1] WIN repeatedly refers to "sole source" contracts pejoratively as if they are an antitrust violation unto themselves, when the opposite is true: courts have recognized competition for sole source contracts as a legitimate form of competition that benefits consumers. *See, e.g.*, *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) (explaining that competition to be an exclusive supplier may constitute "a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress").

████████████████████████████████████

████████████████████████████████████

█████████████████████████████

███████████████████████████████

█████████████████████████

██████████████████████████ Dr. Ford acknowledges the existence of this evidence, and acknowledges that he failed to analyze it. He did not consider how *any* of these customer-specific factors, requirements, and specifications might have affected the result with respect to *any* of the contracts at issue. He did not, in other words, even begin to analyze the potential causes of WIN's claimed injuries.

*Third*, even putting aside bidding requirements, ████████████████

████████████████████████████████████

███████████████████████████████

█████████ In response, WIN asserts that "any bidder" could potentially lose a bid for this reason. (Opp. at 8-9). Of course, that is exactly the point. Again, Dr. Ford did not consider this issue at all.

*Fourth*, Dr. Ford undisputedly ignored the possibility that any competitor other than ACT and WIN could win a contract in the relevant market. This is despite the fact that ██████

███████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████████

For many other potential competitors, ████████████████████████████████

████████████████████████████████████[2]████████████████████████ Dr. Ford did not consider any of these entities, much less explain why they could be safely ignored in calculating damages. Dr. Ford's excuse—that he could not find these competitors on the internet—is no excuse at all. (Dkt. 330-01 at 122:19-124:18.) And the notion that Dr. Ford was entitled to ignore these other undisputed competitors because they did not bid on the contracts Dr. Ford considered is circular, and underscores the impropriety of Dr. Ford's blinkered "analysis" of only two recent contracts.

Again, WIN does not contend that Dr. Ford considered these potential causes or any others, because he clearly did not. Instead, WIN simply attempts to deny reality, contending that because Dr. Ford has not used the term "100%," he does not *really* opine that WIN would have won every contract if not for the alleged unlawful conduct. But yes, he really does:

> Q. And you are saying that WIN would have always won?
>
> A. Yes.
>
> Q. And is that your expert opinion that WIN would have always won or is that your assumption?
>
> A. It is the opinion based on the available data.
>
> […]
>
> Q. So let me just make sure that I understood what you said. Based on two data points, South Carolina and North Carolina where WIN had the lowest bid, you are extrapolating from that that if there was no sole source contracting and WIN went

---

[2] WIN presents a "sham affidavit" from Ms. Chasteen in an attempt to walk back and contradict her own sworn testimony on these points. (Dkt. 329-4.) Ms. Chasteen was extensively questioned on these issues under oath in her capacity as WIN's corporate representative. WIN cannot attempt to "fix" that testimony after the fact by filing a self-serving declaration from the same witness. *See James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, No. 5: 11-374-DCR, 2014 U.S. Dist. LEXIS 59689, at *13 (E.D. Ky. Apr. 30, 2014) ("If the affidavit does directly contradict prior testimony, then the court must strike the affidavit unless the party . . . provides a persuasive justification for the contradiction.") (internal quotation marks omitted).

> up against ACT, WIN would always win because it would always underbid ACT. Is that what you are saying?
>
> A.   That is what I am saying.

(Dkt. 301-02, Ford Dep. Tr. at 185:19-186:3, 187:3-11.).  It is all right there in black and white.

WIN also asserts that Dr. Ford was justified in concluding that WIN is competitively invincible, because he found "no evidence to indicate that WIN would have lost" any contract. (Opp. at 6.)  Indeed, because he looked only at two contracts that WIN *won*!  Simply as a matter of logic, two *victories*, out of hundreds of relevant bidding processes, are not compelling data points in trying to understand why WIN might have *lost* a particular bid or bidding opportunity.

WIN next contends that Dr. Ford had no choice but to limit his entire analysis to two recent contracts, one in South Carolina and one in North Carolina, because additional relevant data "does not exist." (Opp. at 6.)  That is nonsense.  More than six months ago, WIN itself produced a list of allegedly relevant contracts and bidding opportunities that goes well beyond the two WIN victories that Dr. Ford considered.  (Dkt. 301-05.)  Nothing precluded Dr. Ford from analyzing the results of these data points, or the dozens of other bidding processes that have occurred in WIN's proposed relevant market.  WIN had months to conduct any necessary discovery on these points, and also had the benefit of a document production from ACT totaling thousands of documents. Dr. Ford could have analyzed, for example, basic causation issues like whether WIN was qualified to bid on any of the opportunities it says ACT unlawfully excluded it from.  He simply failed to do so.  As a result, his opinion is based on insufficient facts and data regarding the crucial issue of causation, and therefore cannot be presented to the jury under *Daubert* and Rule 702.

## II.   WIN AND DR. FORD'S PLAN TO IGNORE THE EXPERT DISCLOSURE RULES AND TELL THE JURY TO FIND UNDISCLOSED, UNSPECIFIED "ADDITIONAL DAMAGES" AT TRIAL MUST BE REJECTED.

WIN effectively concedes that it plans to violate the expert disclosure rules under the Federal Rules of Civil Procedure. WIN confirms that Dr. Ford plans on testifying at trial that there are (or "may be") additional, unspecified damages that are not in his expert report (not even the improper and untimely "supplemental" report discussed below). WIN does not dispute that Dr. Ford's only justification for not calculating these supposed damages by the Court's expert disclosure deadline (more than 4 months ago) is that, even though the information was available to him, he "really couldn't get it all put together in time." (Dkt. 301-02, Ford Dep. Tr. at 245:17-246:8.) Nevertheless, WIN insists that Dr. Ford should be allowed to tell the jury that "other contracts may form the basis for damages" because (1) Dr. Ford said he wanted to do so at his deposition, and (2) the "same method"—whatever that means[3]—can be used to calculate these additional damages. All of this is absurd.

Every antitrust claimant "has an obligation to come forward with the best, most accurate measure of damages that is reasonably available." *Harkins Amusement Enterprises, Inc. v. Gen. Cinema Corp.*, 748 F. Supp. 1399, 1406 (D. Ariz. 1990) (collecting authorities). The claimant's evidence of antitrust damages must be sufficient to allow the trier of fact to "make a just and reasonable estimate of the damage *that is not based on speculation or guesswork*." *Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1293 (8th Cir. 1988) (collecting authorities) (emphasis added); *see also* II P. Areeda, R. Blair & H. Hovenkamp, Antitrust Law ¶ 391, at 481 (2d ed. 2000) ("Thus, in the world of antitrust damages, 'speculative' is an epithet that is used to characterize insufficient damage proof and dooms the damage

---

[3] Indeed, it is not possible even for an antitrust damages expert, much less a jury of laypeople, to apply a single "methodology" in analyzing damages across multiple states. The products, specifications, customers, competition, and other market dynamics differ significantly across states. Dr. Ford would have to analyze not just the content and prices in each contract, but he would also have to determine the state's criteria for selecting a bid and what that state was looking for in a product suite.

calculation."). According to WIN, it intends to have Dr. Ford expressly invite the jury to engage in such improper speculation. WIN says it intends to have Dr. Ford tell the jury that there "may be" additional damages in a number of states—without telling them what those damages are—and then leave it to the jury to decide for itself, *based on nothing more than speculation*, what those "additional damages" might amount to. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) ("[N]o matter how good" experts' "credentials" may be, they are "not permitted to speculate."); *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ("the whole point of *Daubert* is that experts can't 'speculate.' They need analytically sound bases for their opinions.").

WIN has to take this bizarre position, because it knows it is barred under the federal expert disclosure rules from serving an untimely expert report claiming additional damages that Dr. Ford simply "didn't have time" to opine on before the Court's deadline. *See* Fed. R. Civ. Proc. 37(c)(1) (the exclusion of untimely disclosed expert opinions is "automatic and mandatory" unless the proponent proves the untimely disclosure is "justified" or "harmless."). Such a report is not "justified" and it is not "harmless." "I really couldn't get it all put together in time," (Dkt. 301-02, Ford Dep. Tr. at 245:17-246:8), has never been recognized by any court as a valid justification for an untimely expert report claiming additional damages. (The more plausible explanation is that Dr. Ford could not find a way to increase his damages number at the time of his original report). There is no exception to the federal expert disclosure rules for situations where an expert declares at his deposition that he would like to engage in further untimely analysis of the case. Nor is there any rule that, so long as he purports to use the same methodology, an expert may serve a late expert report—much less one purporting to claim additional damages—whenever he wishes.

Moreover, allowing Dr. Ford to serve another untimely expert report claiming additional damages would also prejudice ACT by allowing WIN, and only WIN, to effectively ignore the Court's pretrial schedule and deadlines in this litigation, which both sides have known about for months. As of the filing of this brief, all fact and expert discovery in this case has been closed for two and four months, respectively; Dr. Ford was deposed regarding his timely report more than two months ago; all *Daubert* motions have been filed and fully briefed; all motions for summary judgment have been filed and will be fully briefed by next week; and the Court's deadline for filing dispositive and expert-related motions has come and gone. WIN's gambit would require ACT to effectively re-do large amounts of work shortly before trial, potentially including an additional deposition, a responsive expert report of its own, and additional summary judgment or *Daubert* briefing. WIN should not be permitted to impose such an unjustified additional expenditure of the Court's and ACT's time and resources.

### III. THE COURT SHOULD EXCLUDE DR. FORD'S SECOND UNTIMELY "SUPPLEMENTAL" EXPERT REPORT.

WIN does not dispute that Dr. Ford's second "supplemental" report, which purports to add $1.42 million in new damages before trebling, is untimely under the expert disclosure rules (it was served nearly 16 weeks after the Court's expert disclosure deadline). This is another straightforward abuse of the expert disclosure process. The ability to "supplement" a prior expert report does not "create a loophole through which a party who submits partial expert witness disclosures…can add to them to her advantage after the court's deadline for doing so has passed." *Luke v. Family Care Urgent Med. Clinics*, 323 Fed. Appx. 496, 500 (9th Cir. 2009).

WIN argues its untimely report is justified because Dr. Ford lacked "complete information" at the time of his original report. But the supposedly missing information was *WIN's own financial data*, which WIN apparently failed to provide to Dr. Ford for more than

four months. That is no justification for an untimely expert report. *See, e.g., Disorderly Kids, LLC v. Family Dollar Stores, Inc.*, No. CV-12-5073 FMO JCGX, 2015 WL 11117073, at *7 (C.D. Cal. Dec. 17, 2015) (excluding plaintiff's damages calculations where plaintiff failed to disclose the calculations until after the discovery cutoff); *Thompson v. Am. Family Mut. Ins. Co.*, No. 2:09-CV-905 JCM RJJ, 2011 WL 3585478, at *4 (D. Nev. Aug. 12, 2011) (granting summary judgment where plaintiff was "precluded from supplementing her damages calculation now that discovery has closed" under Rules 26(a) and 37).

Moreover, even if the Court were to allow Dr. Ford's untimely "second supplemental" report, WIN has significantly prejudiced ACT's ability to address that report through the pretrial expert discovery process. Contrary to WIN's assertion, ACT has not even been able to determine whether an additional deposition of Dr. Ford is needed, because WIN took more than two weeks to provide the data underlying Dr. Ford's new damages opinion, doing so only last week, and has declined to explain clear discrepancies in that data. ACT is now finally in a position to analyze that data and, if Dr. Ford's latest report is allowed to stand, prepare a supplemental expert report of its own responding to Dr. Ford's untimely new analysis.

The bottom line is that ACT should not be forced to resume the expert discovery process, at significant burden and expense, long after the Court's expert discovery cutoff, because WIN declined to give its expert "complete data" for four months. Dr. Ford's untimely "second supplemental" report should be excluded.

## IV. CONCLUSION

For the reasons explained above and in ACT's opening brief, Dr. Ford's expert opinions must be excluded under Rule 702 and *Daubert*.

Respectfully submitted, this 20th day of March, 2020.

By: */s/ Dylan I. Ballard (Admitted Pro Hac Vice)*
Thomas S. Scott, Jr., BPR #: 001086
Christopher T. Cain, BPR #: 19997
SCOTT & CAIN, PLLC
606 W. Main Street, Suite 222
Knoxville, TN 37902
(865) 525-2150
scott@scottandcain.com
cain@scottandcain.com

Laura L. Chapman, Esq. (*Admitted Pro Hac Vice*)
Dylan I. Ballard, Esq. (*Admitted Pro Hac Vice*)
Yasamin Parsafar, Esq. (*Admitted Pro Hac Vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111
(415) 434-9100
lchapman@sheppardmullin.com
yparsafar@sheppardmullin.com
dballard@sheppardmullin.com

Attorneys for Plaintiff and Counter-Defendant, ACT, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2020, a true and correct copy of the foregoing REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF AND COUNTER-DEFENDANT ACT, INC.'S DAUBERT MOTION TO EXCLUDE DEFENDANT AND COUNTER-CLAIMANT WORLDWIDE INTERACTIVE NETWORK, INC.'S ANTITRUST DAMAGES EXPERT TESTIMONY OF GEORGE S. FORD, PHD was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

                                                  */s/ Dylan I. Ballard (Admitted Pro Hac Vice)*
                                                  Dylan I. Ballard