IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ACT, INC., | : |
| | : Case No. 3:18-cv-00186-TRM-HBG |
| Plaintiff and Counter-Defendant, | : |
| v. | : |
| WORLDWIDE INTERACTIVE NETWORK, INC. and TERESA CHASTEEN, | : JURY TRIAL DEMANDED |
| Defendants and Counter-Claimants. | : |

**DECLARATION OF DAVID NOLTE IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS FOR VIOLATION OF COURT ORDER (RULE 37(B))**

I, David Nolte, declare as follows:

1. I have over 40 years of experience as a Certified Public Accountant. I am the Founder of Fulcrum Financial Inquiry LLP. My client work focuses on providing valuation of businesses and intangible business assets, economic studies, royalty and fraud auditing and litigation-related financial analysis. I have worked with a broad range of firms and industries in both litigation and non-litigation settings. In the last four years, I have provided damages related testimony in thirty-six cases. Over the course of my career, I have provided hundreds of damages-related expert reports. I have worked on hundreds of intellectual property cases in which I have been retained as an expert on the issue of monetary recovery. Monetary recovery includes actual damages and the profits earned by the defendant/alleged infringer.

2. I was engaged by ACT as an expert on the issue of monetary recovery. On May 20, 2019, I served an expert report attempting to: (1) Calculate WIN's revenues and profits under a remedy of disgorgement (aka unjust enrichment); and (2) Calculate ACT's lost profits pertaining the Subject Contracts. (*See* Ex. K at 2.)

3. On May 29, 2019, I served an Amended Report ("Report") with some modifications. As indicated in my Report, the disgorgement assessment requires "compil[ing] certain of WIN's sales data from reports produced in this action; and . . . assess[ing] and summariz[ing] deductible costs associated with those sales if there are sufficient reliable contemporaneous business records to allow such a calculation." (Ex. K at 2.)

4. In preparation for my work in this case, I asked counsel for ACT to provide accounting documents produced by Defendant Worldwide Interactive Network, Inc. ("WIN") showing relevant revenues and related costs. My team reviewed over a thousand of WIN's documents, but none of these records were useful contemporaneous summaries of accounting information, as would typically be produced in this situation. Accordingly, I provided ACT with a targeted list of document requests and interrogatories directed to the information relevant to my assessment. I understand ACT served those requests to WIN on March 7, 2019, over 10 weeks before I served my report. WIN did not produce anything useful in response.

5. In reviewing WIN's documents, we learned that WIN, like many companies, uses QuickBooks to store and track its financial information, including relevant cost and revenue information. Because it is WIN's contemporaneous business record, the QuickBooks Company file ("QBW"), QuickBooks Accounting Transmission ("QBA"), or QuickBooks Backup ("QBB") file formats all provide accurate, complete and useful information. I regularly work with and rely

on QuickBooks files and data to analyze financial information and routinely obtain such data from both my clients and opposing parties in my engagements.

6. Although WIN produced a native QuickBooks file in .QBW format, the file was password protected and WIN did not produce the password, even though the file was designated "Highly Confidential Attorneys' Eyes Only" under the protective order. Instead, my team was forced to spend hours reviewing and trying to piece together hundreds of invoices and other random financial documents to obtain financial information.

7. In an apparent attempt to avoid producing its QuickBooks file, WIN provided self-created "summaries" of its revenue information from several states. But these summaries do not account for all relevant revenues received by WIN. My team discovered numerous invoices related to WIN's sale of the relevant assessments, which included revenue that was not reflected in WIN's self-created "revenue summaries." These revenue summaries contained inconsistencies and were inaccurate and incomplete

8. As I explained in my report, WIN's incomplete records were not helpful for several reasons: (1) the documents included expenses irrelevant to disgorgement calculation; (2) the documents were projections, not actual results; (3) the documents were too old and more recent data could have been produced without an undue burden; (4) the documents summarized revenues and expenses at a company-wide level and WIN has several products and services it offers, each with unique cost structures; (5) my firm was not provided other contemporaneous business records that provide reliable evidence of WIN's costs of performing the Subject Contracts; and (6) WIN is attempting to use prepared-for-litigation summaries that allegedly are based on the QuickBooks data, but does not intend to provide ACT with any meaningful opportunity to critique how these prepared-for-litigation summaries have been prepared.

9. I also told WIN's attorney, Kyle Carpenter, multiple times during my deposition on August 7, 2019 that I needed WIN's financial information to complete my assessments. Specifically, I told WIN's attorney: "My preference would be not to be using Microsoft Excel spreadsheets, but to use contemporaneous accounting records . . . ." (Ex. L at 94:12-14.) I also stated: "WIN absolutely hid the ball. We asked for -- and WIN actually produced -- QuickBook records that would've solved all this, would've saved my firm a lot of time, and saved ACT a bunch of professional fees, and would've gotten better answers. But WIN decided to put a password on the thing that -- on the file they produced, and then refused to provide a password. So WIN has not provided its own records -- that could've been easily produced in less time than I've given you this answer -- and that's why you have to read this stuff and ask me a bunch of questions, and I've got to have umpteen footnotes in it. It's because WIN hid the ball with respect to its accounting records." (Ex. L at 87:12-24.) Additionally, in regard to the QuickBooks files, I stated: "[T]here's accounting records that would've made this whole assignment easier, and if you want me to do a - - a better, complete and less expensive job, I still would appreciate getting those records." (Ex. L at 88:5-9.)

10. In an April 30, 2019 "Response to the Emergency Motion of Plaintiff ACT, Inc. to Compel Defendant Worldwide Interactive Network, Inc's Supplemental Responses to Plaintiff's Second Set of Interrogatories and Second and Third sets of Requests for Production" (Dkt. 84 at 9-10), WIN contends that WIN did not produce the password to its contemporaneous QuickBooks file because it was concerned about providing "active links" to its bank accounts. That is not a valid excuse. I work regularly with QuickBooks files in native format. Many of those files are from adverse parties in litigation. WIN's claimed security issues could be addressed through any one of the following means:

a. The simplest solution would have been to provide a .QBA file. A QBA file is a format used for sharing information with outside accountants, which does not allow the accountant to access banking services. *See* https://quickbooks.intuit.com/learn-support/en-us/accountant-s-copy-passwords/use-the-accountant-s-copy/00/203725# (stating, under the header "What else you can (and can't) do" that accountants "can't . . . Use online banking services").

b. WIN could also have made a copy of their .QBW file and removed the online access credentials before producing it in the litigation.

c. Another solution would be to create a user name for my firm and prevent access to the online banking function for that user.

11. To the extent that WIN has some other reason for not producing the native QuickBooks files, I would expect counsel for WIN to discuss it with counsel for ACT so that we can work with counsel for WIN to address any issues. Such a cooperative effort in meeting and conferring to resolve claimed issues typically occurs when concerns exist regarding production of native files and/or confidential information.

12. I understand WIN produced six documents that it claimed contained the relevant financial information (WIN-02995415 (Ex. M), WIN-02995556 (Ex. N), WIN-02995563 (Ex. O), WIN-02995701 (Ex. P), WIN-02995713 (Ex. Q), WIN-02995714 (Ex. R)). My team reviewed each of these documents and determined they were not a representation of "completed financial information." Additionally, all six documents appear to be created for the purposes of this litigation.

13. For example, four of these six documents produced by WIN appear to be reports generated from QuickBooks. (WIN-02995415 (Ex. M), WIN-2995556 (Ex. N), WIN-02995563

SMRH:4853-0291-8329.1 -5-

Case 3:18-cv-00186-TRM-HBG Document 367-1 Filed 04/10/20 Page 5 of 12 PageID #: 32508

(Ex. O), WIN-01995714 (Ex. R).) By definition, in creating an extraction in QuickBooks, WIN can specify what information is included in the extract in a manner that is incomplete. Without an original " .QBW", "QBA", or ".QBB" file to compare, I cannot determine the completeness of these extracts.

14. Providing the QuickBooks file would not be burdensome to WIN. In fact, WIN has already provided the QuickBooks file; the information I am missing is the password. In order for me to have access to WIN's QuickBooks file, I need WIN only to provide me the password and run a refresh on the files so the information is up to date.

15. Another document, titled ▇▇▇▇▇▇▇▇▇▇▇▇▇ WIN-02995713 (Ex. Q), is a single page PDF. This document does not appear to be an extract from QuickBooks and there is no way to determine what information was used to generate this document without comparing it to the original QuickBooks record (.QBW, QBA, or .QBB) record. Additional detail is needed to determine whether this one-page PDF includes costs that would not normally be deductible in a disgorgement calculation. For example, this page adds ▇▇▇▇▇▇▇ to certain cost categories, without any explanation or detail of what the "▇▇▇▇▇" includes.

16. The sixth document, WIN-02995714 (Ex. R), appears to be an income statement prepared using the QuickBooks software which was prepared specifically for this litigation. The report shows totals for nearly eight years. Clearly, additional relevant information is available that is not included on this prepared-for-litigation report.

17. The PDF files that WIN produced are also inefficient to work with because they are not sortable and cannot be used for mathematical processes. The native files are therefore needed to avoid unnecessary and wasteful clerical efforts involving the PDF files that WIN produced. For example, WIN-02995563 – 5700 (Ex. O) is a 138-page report that includes redactions. Because of

the redactions, the total on the last page of the report is not useful by itself. If the information that has not been redacted is to be used for any mathematical process or sorting, these 138 pages would need to be re-input. Putting aside the desire to make the task difficult on one's opposing party, there is no good reason why this additional clerical effort should be required. Production of data in a native, executable form typically occurs in this situation.

18. Additionally, the extractions provided by WIN are incomplete on their face. For example:

   a. In a QuickBooks extraction, an ellipsis, "...", indicates that a field is too short and that information has been cut off. These ellipses appear in multiple places in WIN's production. An example of this is on page 44 of the ▮▮▮▮▮." WIN-02995458. (Ex. M at 44.) The first memo line under the ▮▮▮▮▮ ▮▮▮▮ reads ▮▮▮▮▮▮▮▮▮▮ ..." Multiplied out, ▮▮▮ by ▮ equals ▮▮▮. However, the ▮▮▮ column for that row is ▮▮. A second example appears on the 4th line of the same page, WIN-02995458 (Ex. M at 44), a transaction for ▮▮▮ The memo reads ▮▮▮ ▮▮▮▮▮▮▮ Multiplied out, ▮▮▮ by ▮ equals ▮▮▮.

   b. The extractions pertaining to South Carolina, WIN-02995556 (Ex. N) and Florida, WIN-01995563 (Ex. O) contain redactions. For instance, on page 3 of the ▮▮ ▮▮▮▮▮ WIN-02995558 multiple lines have been redacted in full. (Ex. N at 3.) Additional examples of redactions can be found on pages 1, 2, 7 and 9-14 of the ▮▮▮▮▮ which I understand

to be ▉. (Ex. O.) I understand the Court Order allowed Defendant to redact *passwords or account information* (Dkt. 224 at 7), but given these redactions are of lines in the report, it is highly unlikely they are concealing such information. Similarly, since the redacted information are accounting transactions, the data could not reasonably be expected to be protected by any legal privileges.

    c. "▉" were only provided only for South Carolina and Florida.

19. As another example of these documents' "incompleteness" there are multiple inconsistencies between the documents that have not been explained. For example:

    a. The revenues listed "▉ WIN-02995415 (Ex. M) for the ▉ (▉, WIN-02995465 (Ex. M at 51)) and the ▉ (▉, WIN-02995466 (Ex. M at 52)) do not, separately or in the aggregate, match the revenue listed in ▉ ($▉, WIN-02995700 (Ex. O at 138)). These reports both cover ▉.

    b. The revenue amount listed "▉" (WIN-02995415) for ▉, WIN-02995538 (Ex. M at 124)) do not match the revenue amount listed in the ▉ document (▉, WIN0-02995562 (Ex. N at 7)). The ▉ only covers ▉, so it is unclear why this document has a higher revenue than the "▉" report, which covers a longer time period.

20. The inconsistencies described in the preceding paragraph would likely be explained or resolved if I had access to WIN's native QuickBooks (.QBW, .QBA, .QBB) file. The additional detail in the source records (i.e., the native QuickBooks file) is needed to understand why the discrepancies are occurring, and which of the alternatives is a more accurate amount. Putting aside the days of wasted of time involved when using PDF records, it is inherently unfair to ask an outside accountant (such as my firm) to provide an accounting answer while the author of the information (i.e., WIN) is able to make one-sided criticism(s) using information that WIN did not provide.

21. WIN's production of cost information is egregiously inadequate and far from "complete." The single page PDF titled "███████████████," WIN-02995713 (Ex. Q) discussed above in Paragraph 15 contains little detail. Specifically, this document fails to include: (1) the period covered by the document, (2) the corresponding revenues for the listed costs, (3) the transactions that comprise these totals and (4) any explanation about how these costs were categorized. It is also unclear how this document relates to the costs included in WIN's "█████████████████", WIN-02995714 (Ex. R), because (i) the two reports use different cost categories, different cost descriptions, and different time periods, and (ii) a part of the income statement is redacted, Overall, this document is a single piece of paper purporting to cover nearly eight years of costs, which appears to be created solely for the purposes of litigation. This page clearly does not answer the vast majority of reasonable questions regarding the deductions that WIN apparently wishes to make in this disgorgement calculation. One such key question involves the ability to analyze whether the costs shown are variable (i.e., the cost changes with additional revenue) or if a fixed cost which would not be deductible at all. The lack of relevant information falls well outside of what one typically sees from a defendant in this situation.

22. Additionally, I understand that in their November 25, 2019 Second Supplemental Responses to Plaintiff's Interrogatories, pages 48-49 (Ex. A), WIN specifically identified two documents as responsive to ACT's Interrogatory requests pertaining to costs - the " ███████ ███████████████████████████████████", WIN-02995563 (Ex. O) and the " ████████████ ██████████████", WIN-0299556 (Ex. N). However, these two documents only pertain to the states of South Carolina and Florida Ready to Work and do not include any cost information relating to the other state contracts at issue in this case, Arizona, Kentucky, and West Virginia. It appears that none of the documents produced by WIN contain cost information specifically pertaining to these states. Without the cost information from these states, no cost deduction is calculatable without speculation or unsupported assumptions.

23. It is my understanding that after ACT informed WIN that the six documents produced on November 25, 2019 were inadequate, WIN asked ACT to list specifically the documents or information needed by ACT's expert and WIN would see if it could produce them. I therefore provided ACT with a list of 6 types of financial documents that were outstanding from my prior requests, in addition to WIN's QuickBooks files.

24. In addition to the QuickBooks file, the six types of documents I requested included: (1) monthly and annual income statements, (2) annual balance sheets, annual statements of cash flow, annual trial balances, monthly account payable reports, monthly account receivable reports, (3) documents showing WIN's costs, (4) documents showing WIN's revenue, (5) documents relating to non-assessment revenue, and (6) forward looking estimates.

25. In response to these specific requests, WIN did not produce its QuickBooks file, which would have likely allowed me to most easily and efficiently address all of the requested information. Instead, it produced a spreadsheet identifying 249 documents that it claimed

contained the relevant financial information. My team reviewed each of these documents and they were mostly useless.

26. For example, WIN produced QuickBooks extracts of weekly A/P and A/R aging schedules. We are not sure this was even requested and, even if it were, these are not useful because (i) the most recent is October 2018 and (ii) multiple periods are missing. In addition, nearly all of these are printed to a PDF, and would require Fulcrum to convert them to a useable format in order to perform substantive analysis.

27. As another example, WIN produced QuickBooks transactional details, extracted into Microsoft Excel, of various profit and loss accounts, but there is information missing from many years and even partial months. For example, there is no relevant profit and loss information from 2015, 2016, 2018 or 2019, even though that data presumably is available. WIN also produced QuickBooks extracts of balance sheets, which like the profit and loss statements, were highly irregular and incomplete. Additionally, included throughout WIN's "new" production were multiple largely blank transmittal emails and duplicate production of documents already received and reviewed earlier in this case.

28. In summary, the records WIN provided to date are incomplete, inconsistent, and unduly expensive to use. An outside accountant such as my firm should be afforded use of the same records WIN has available when asserting that (1) my calculations are incorrect, and/or (2) costs are appropriate to deduct in a disgorgement calculation.

Executed on this 10th day of April, 2020, at Los Angeles County, California.

*David Nolte*
David Nolte

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2020, a true and correct copy of the foregoing DECLARATION OF DAVID NOLTE IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS FOR VIOLATION OF COURT ORDER (RULE 37(B)) was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

*/s/ Laura L. Chapman (Admitted Pro Hac Vice)*
Laura L. Chapman
