# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| ACT, INC., | ) | |
| | ) | Case No. 3:18-cv-186 |
| _Plaintiff & Counter-Defendant_, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge H. Bruce Guyton |
| WORLDWIDE INTERACTIVE | ) | |
| NETWORK and TERESA CHASTEEN, | ) | |
| | ) | |
| _Defendants & Counter-Claimant_. | ) | |

## MEMORANDUM OPINION

Before the Court is Defendant and Counter-Claimant Worldwide Interactive Network's ("WIN") motion for leave to amend its answer to Plaintiff and Counter-Defendant ACT, Inc.'s ("ACT") first amended complaint and counterclaim (Doc. 375). For the reasons set forth below, WIN's motion will be **GRANTED IN PART AND DENIED IN PART**.

## I.     RELEVANT PROCEDURAL HISTORY

This case was initially filed on May 14, 2018. (Doc. 1.) Pursuant to the original scheduling order, all motions to amend the pleadings were to be filed no later than May 6, 2019. (Doc. 32, at 2.) On April 11, 2019, ACT filed a motion for emergency relief to amend the scheduling order. (Doc. 75.) ACT argued that certain deadlines needed to be extended because of WIN's refusal to comply with discovery requests. (_Id._ at 3.) The Court granted ACT's motion and reset the deadline for amendment of pleadings to June 4, 2019. (Doc. 76, at 2.)

On June 4, 2019, ACT filed its first motion to amend its complaint (Doc. 101), stating that, "[o]ver the course of discovery, WIN has produced hundreds of thousands of documents in

response to ACT's requests for production" and that "ACT has also taken the individual deposition of Teresa Chasteen." (*Id.* at 2.) ACT stated that:

> Based on ACT's review of WIN's documents produced in discovery and the deposition testimony of Ms. Chasteen, ACT has discovered new information that requires the filing of an amended complaint to add Ms. Chasteen as an additional defendant, to add new claims for relief, and to allege additional facts discovered by ACT that further support ACT's claims.

(*Id.*) ACT had deposed Chasteen on May 31, 2019. (Doc. 169, at 13.) ACT attached a proposed amended complaint to its motion to amend. (Doc. 101-1.)

The Court granted ACT's motion to file an amended complaint as well as WIN's motion to file an amended answer. (Doc. 110.) On July 10, 2019, ACT filed its first amended complaint (Doc. 121) and WIN filed its amended answer and counterclaim (Doc. 120). ACT's first amended complaint differed from its proposed amended complaint in that it added a claim for removal or alteration of copyright management information. (*Compare* Doc. 101-1 at 2, *with* Doc. 121, at 1.) The amended complaint added three claims in total: (1) a claim for removal or alteration of copyright management information under 17 U.S.C. § 1202 *et seq.*; (2) a claim under the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*; and (3) a claim of consumer fraud under Iowa Code Ann. § 714H *et seq.* (Doc. 121.) It also added Chasteen as a defendant. (*Id.*) In its amended answer to the complaint and counterclaim, WIN added a counterclaim for violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. (Doc. 120.)

On August 2, 2019, WIN filed a motion to dismiss each of the newly added claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim (Doc. 146). On August 5, 2019, Chasteen filed a motion to dismiss all claims against her under Rule 12(b)(6) (Doc. 148). On August 20, 2019, the Court issued a new scheduling order in this matter (Doc. 164). This was the fifth scheduling order in the litigation. (*See* Docs. 32, 76, 87, 93, 64.) That scheduling

2

order—now the operative scheduling order, save a few subsequent changes—stated that no further amendments to the pleadings would be permitted without leave of court. (Doc. 164, at 4.)

Three days after that order was issued, ACT filed a motion for leave to file a second amended complaint (Doc. 169). WIN opposed ACT's motion, arguing that "ACT [had] not acted diligently in attempting to meet the deadline for amending pleadings" and that "WIN would be unduly prejudiced by the amendment at [that] stage in the litigation." (Doc. 199, at 8–9.) The Court ultimately denied ACT's motion for leave to amend, finding that ACT had not shown good cause for its failure to move to amend earlier. (Doc. 214.)

When the Court amended the scheduling order on August 20, 2019, it ordered that, with regard to claims and counterclaims raised in the initial pleadings, "[n]o further discovery requests shall be made without a showing of **good cause**." (Doc. 164, at 2 (emphasis in original).) Discovery relating to claims raised for the first time in the amended pleadings (Docs. 120, 121) closed on January 15, 2020. (Doc. 164, at 3.) This matter is set for trial on August 10, 2020. (Doc. 283, at 2.)

At this stage in the litigation, only the following claims remain unresolved: (1) ACT's Lanham Act claims against both Defendants[1]; (2) ACT's breach-of-contract claim against WIN; (3) ACT's copyright-infringement claim against Defendant Teresa Chasteen; (4) WIN's false-advertising counterclaim; (5) WIN's intentional-interference-with-business-relationships counterclaim; and (6) WIN's counterclaim for a declaratory judgment regarding WIN's Lanham Act liability. The Court has already considered and denied ACT's motion for summary

---

[1] However, the Court has limited the scope of these claims as they relate to ACT's claimed certification marks. (*See* Doc. 160.)

judgment on WIN's Lanham Act false-advertising counterclaim and intentional-interference-with-business-relationships counterclaim. (*See* Doc. 316.)

On April 24, 2020, WIN filed the present motion to amend its answer and counterclaim (Doc. 375). In WIN's proposed amended answer and counterclaim, WIN seeks to:

> (i) add additional factual allegations in the Factual Background section of its Counterclaim contained in Paragraphs 308–313; (ii) add additional factual allegations supporting its False Advertising claim contained in Paragraphs 316–322; and (iii) add additional factual allegations supporting its Intentional Interference with Business Relations claim contained in Paragraphs 324–335.

(Doc. 375, at 1.) WIN's motion is now ripe for review.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 15, if a party can no longer amend its pleading as a matter of course, it "may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). However, "[t]he court should freely give leave when justice so requires." *Id.*; *see also Brown v. Chapman*, 814 F.3d 436, 442 (6th Cir. 2016) ("Because Rule 15(a)(2) directs courts to 'freely give leave when justice so requires,' the rule embodies a 'liberal amendment policy.'"). Denial of leave to amend may nevertheless be appropriate when there has been "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

"A proposed amendment is futile if the amendment could not withstand a 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) (quoting *Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 382–83 (6th Cir.1993)). In determining whether an amendment would survive a 12(b)(6) motion, the

Court considers not whether the plaintiff will ultimately prevail, but whether the facts permit the Court to infer "more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the veracity of all well-pleaded factual allegations in the complaint. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). This assumption of veracity, however, does not extend to bare assertions of legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986). After sorting the factual allegations from the legal conclusions, the Court considers whether the factual allegations, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

"Delay by itself is not sufficient reason to deny a motion to amend." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458–59 (6th Cir. 2001); *see also Janikowski v. Bendix Corp.*, 823 F.2d 945, 951 (6th Cir. 1987) ("Delay that is not intended to harass the defendant is not in itself a permissible reason to refuse leave to amend."). However, "[w]hen amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier," *Wade*, 259 F.3d at 459, and "the expiration of a relevant scheduling order deadline may foreclose the parties' opportunity to rely upon Rule 15(a)'s liberal standard." *United States ex rel. Martin Marietta Materials, Inc. v. Nelson, Inc.*, 286 F.R.D. 327, 909 (W.D. Tenn. 2012). Before a court can consider the propriety of an amendment under Rule 15(a), a plaintiff seeking leave to amend after the deadline in the scheduling order has passed "first must show good cause

under Rule 16(b) for failure earlier to seek leave to amend." *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003); *see also id.* at 906 (noting that Rule 16 "is designed to ensure that 'at some point both the parties and the pleadings will be fixed'" (quoting Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment)).

### III. ANALYSIS

#### A. Good Cause Under Rule 16

##### i. WIN's Diligence

"The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (citations and internal quotation marks omitted). WIN's motion does not address the Rule 16 standard or its diligence in seeking to amend earlier. (*See* Docs. 375, 376.) Rather, WIN argues that it should be freely granted leave to amend under Rule 15 because there is no undue delay, bad faith, failure to cure deficiencies in previous amendments, futility of amendment, or undue prejudice to ACT. (Doc. 376, at 7.) However, the Court must first determine whether WIN has shown good cause under Rule 16 before it can consider whether leave to amend should be granted under Rule 15. *See Leary*, 349 F.3d at 909.

WIN filed the instant motion to amend on April 24, 2020. (*See* Doc. 375.) WIN's motion is based on a letter that ACT mailed to WIN's current customer, the State of Arizona, on April 1, 2020. (*See id.* at 2; Doc. 376, at 1; *see also* Doc. 375-1 (copy of the letter).) WIN argues that the letter "contains false and misleading statements regarding WIN's products and position in this lawsuit[ ] and an implied threat to sue Arizona if it continues using WIN's assessments." (Doc. 376, at 1.) WIN believes that ACT sent similar letters to other customers of WIN's but does not provide any information about when these letters were sent. (*Id.*)

WIN argues that it could not have brought the instant motion to amend any earlier, "because ACT waited until the close of discovery to write the letters and make the verbal statements that form the basis of [WIN's] Motion." (*Id.* at 7.) ACT does not dispute this argument or otherwise argue that WIN was not diligent in seeking leave to amend based on the letter. (*See* Doc. 389.) The Court agrees that, because ACT did not send the letter until April 1, 2020, WIN could not have filed the instant motion before the scheduling order's deadline for the amendment of pleadings or before the close of discovery. (*See* Doc. 164.)

### ii. Prejudice to ACT

In the Sixth Circuit, a district court deciding whether to amend a scheduling order to allow a late amendment of pleadings must make "a determination of the potential prejudice to the nonmovant" in addition to determining whether there was good cause for the delay. *Leary*, 349 F.3d at 909; *see also Janikowski*, 823 F.2d at 951 (observing that denial of leave to amend requires "at least some significant showing of prejudice to the opponent"). In determining what constitutes prejudice, courts consider whether the amendment would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial; significantly delay the resolution of the dispute; or prevent the plaintiff from bringing a timely action in another jurisdiction." *Phelps v. McClellan,* 30 F.3d 658, 662–63 (6th Cir. 1994).

Here, any prejudice to ACT is exceedingly limited because ACT sent the relevant letter a few months before trial, knowing that this litigation was ongoing and that WIN has brought false-advertising and intentional-interference-with-business relationship counterclaims against it based on similar statements in similar letters. (*See* Doc. 120.) Though trial is close and discovery has closed, ACT has no need to conduct any discovery or expend additional resources in preparing to defend against the new factual allegations. The letters were written by ACT, and,

thus, ACT is familiar with their contents and context.  Moreover, ACT already raised many of the arguments it raises in response to WIN's proposed amendment in its motion for summary judgment on WIN's false-advertising and intentional-interference-with-business-relationships counterclaim.  (*Compare* Doc. 209, *with* Doc. 376.)

WIN has shown good cause for its failure to move to amend before the scheduling order's deadline for amendment to pleadings.  WIN could not have brought this motion before the amendment deadline passed, and the prejudice to ACT is limited.  Accordingly, the Court will consider whether leave to amend should be granted under Rule 15.

### B.  Leave to Amend Under Rule 15

As previously stated, leave to amend may be denied, even under Rule 15's liberal standard, when there has been "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  *Foman,* 371 U.S. at 182.  Here, ACT opposes WIN's request for leave to amend on the grounds that the amendment would be futile.[2]  (*See* Doc. 389, at 2.)

#### i.  *False-Advertising Counterclaim*

To succeed on a Lanham Act false-advertising claim, a claimant must show:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it

---

[2] ACT also argues that WIN's existing counterclaims should be dismissed for lack of standing.  (*See* Doc. 389, at 2.)  However, the time for dispositive motions on these claims has long passed.  (*See* Doc. 164.)  ACT did not raise this standing issue in a timely 12(b)(6) motion to dismiss nor did it raise the issue in its summary judgment motion on WIN's counterclaims.  (*See* Doc. 209.)  The time for arguing pleading deficiencies relating to the counterclaims in the original pleadings or the first amended pleadings has long passed, and the Court will not consider such arguments now.  For the sake of deciding WIN's motion to amend, the Court will only consider the standing issue and other arguments as they relate to the new factual allegations WIN seeks to add.

will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999) (hereinafter "*Podiatric Physicians*"); *see also Wysong Corp. v. APN, Inc*, 889 F.3d 267, 270 (6th Cir. 2018).

a.   Whether the Letter Constitutes "Advertising"

ACT first argues that WIN's proposed amendment to its false-advertising claim is futile because the letter does not constitute commercial advertising. (*Id.* at 6.) In the Sixth Circuit, "commercial advertising or promotion" is defined as:

> (1) commercial speech; (2) for the purpose of influencing customers to buy the [opposing party's] goods or services; (3) that is disseminated either widely enough to the relevant purchasing public to constitute advertising or promotion within that industry or to a substantial portion of the [claimant's] or [opposing party's] existing customer or client base.

*Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 801 (6th Cir. 2015). ACT argues that the letter cannot serve as the basis of WIN's counterclaim because "public dissemination . . . requires more than an allegedly libelous, private letter delivered to a single entity." (*Id.* (quoting *Am. Needle & Novelty, Inc. v. Drew Pearson Mktg. Inc.*, 820 F. Supp. 1072, 1077–78 (N.D. Ill. 1993)).

However, this letter is not the only letter WIN claims that ACT has sent to ACT's clients and to WIN's. (*See* Doc. 375-2, at 50–52.) And the "touchstone" of the dissemination inquiry is "that the contested representations are part of an organized campaign to penetrate the relevant market," though such campaigns, "especially those aimed at previous customers, may not necessarily entail widespread, market-wide dissemination." *Id.* at 800–01; *see also The Hillman Grp., Inc. v. Minute Key, Inc.*, 317 F. Supp. 3d 961, 979 (S.D. Ohio 2018) ("Statements to a

9

single customer can trigger the protections of the Lanham Act 'if the market at issue is very small and discrete[.]'" (citing *Champion Labs., Inc. v. Parker-Hannifin Corp.*, 616 F. Supp. 2d 684, 694 (E.D. Mich. 2009))). In the Sixth Circuit, a claimant need only show dissemination "wide enough to the relevant purchasing public to constitute advertising or promotion within that industry" or dissemination "to a substantial portion of the [claimant's] or [opposing party's] existing customer or client base." *Grubbs*, 807 F.3d at 801.

The Court has already rejected ACT's argument that the other letters ACT sent, which form the basis of WIN's false-advertising counterclaim as stated in its previous answer and counterclaim, could not support a Lanham Act false-advertising claim because the letters were not widely disseminated and do not qualify as commercial advertising. (*See* Doc. 316, at 71.) Allegations concerning additional letters only increase the level of dissemination of the statements at issue. The Court will not find that WIN's proposed amended counterclaim fails to state a false-advertising claim on this ground.

<u>b.</u>  <u>Whether the Letter is "Privileged"</u>

ACT next argues that the April 1, 2020 letter is privileged. (Doc. 389, at 6–8.) Specifically, ACT argues that the letter falls into the category of "cease-and-desist" letters, which it contends are privileged from false-advertising claims. (*Id.* at 6–7.) However, each of the cases ACT cites in support of this argument relate to cease-and-desist letters concerning patent infringement rather than copyright or trademark infringement. (*See id.* at 7.) The only authority ACT cites that relates to copyright infringement is 17 U.S.C. § 401, which authorizes copyright owners to place a notice of copyright "on publicly distributed copies from which the work can be visually perceived." (*See id.*) Similarly, ACT cites 15 U.S.C. § 1111, which authorizes a trademark owner to "give notice that his mark is registered by displaying with the

mark the words 'Registered in U.S. Patent and Trademark Office' or 'Reg. U.S. Pat & Tm. Off.'
Or the letter R enclosed within a circle," to argue that the same privilege applies to trademarks.
(*See id.*)

The authority ACT cites does not provide any support for its proposition that the April 1,
2020, letter is "privileged." Providing notice of copyright or trademark protection on the
protected work itself is quite different from sending letters to customers of other businesses—
even infringing businesses. The letter does not involve notice of copyright protection on copies
of the Skill Definitions themselves, nor does it give notice that "PLATINUM," "GOLD,"
"SILVER," and "BRONZE" are registered with the U.S. Patent and Trademark Office
("USPTO"). (*See* Doc. 376-1.) Moreover, ACT has admitted that the marks at issue in this case
have not been registered with the U.S. Patent and Trade Office, so 15 U.S.C. § 1111 has no
applicability to the issue at hand. (*See* Doc. 88, at 14.) Because there is no relevant authority to
support ACT's position, the proposed amendment is not futile based on the letter's "privileged"
status.

### c. Whether the Letter Includes False or Misleading Statements

Next, ACT argues that the proposed additional factual allegations contain no false or
misleading statements. (Doc. 389, at 8–11.) With respect to the first element of a false-
advertising claim, a party asserting such a claim may either show that the statement of fact is:
(1) literally false or (2) misleading. *Wysong*, 889 F.3d at 270–71. If the party asserting the
claim can show that the advertising statement was literally false, courts presume that consumers
were actually deceived by the statement. *Id.* On the other hand, if the party asserting the claim
shows that the advertising was misleading, the claimant must then show "that a 'significant

portion' of reasonable consumers were *actually* deceived" by the statement. *Id.* at 271 (emphasis in original) (noting that actual deception is traditionally shown with consumer surveys). *Id.*

WIN alleges that certain statements in the letter are literally false. (*See* Doc. 375, at 2; Doc. 375-2, at 51; Doc. 376, at 3–4; Doc. 391, at 7.) The proposed amended counterclaim specifically identifies ACT's statements "that Arizona is infringing ACT's copyrights and certification marks and that, assuming ACT has trademark rights in its alleged certification marks, holders of certificates issued in connection with WIN's assessments are willful infringers." (Doc. 375-2, at 51.)

WIN alleges that other "implied" statements in the letter are "false or misleading." (*See id.*; Doc. 376, at 4.) WIN points to ACT's "implied statement that it will bring legal action against Arizona if Arizona continues to infringe ACT's copyrights," "its implied statement that WIN's assessments violate ACT's copyrights and that Arizona should discontinue use of WIN's assessments," and "its implied statement that WIN's legal position regarding ACT's alleged trademark rights is based solely on the US Patent and Trademark Office decisions" as examples of such statements. (Doc. 357-2, at 51.) However, only unambiguous statements can be literally false. *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 737 (6th Cir. 2012) (citations omitted); *see also Wysong*, 889 F.3d at 271 (citing *Innovation Ventures*, 694 F.3d, at 737) (noting that to be literally false, a statement must be "unambiguously deceptive"). When it is a "close question" whether a statement is literally false, it is not literally false. *Innovation Ventures*, 694 F.3d at 737. Therefore, for the "implied" statements WIN identifies to support a colorable false-advertising claim, WIN must allege that the statements are misleading and that reasonable consumers were "actually deceived" by the statements. *Wysong*, 889 F.3d at 271.

However, WIN has not alleged that any of its customers were "actually deceived" by the allegedly misleading or "impliedly false" statements. Rather, WIN's proposed amended counterclaim alleges only that "ACT's false and misleading statements are *likely* to mislead the public." (Doc. 375-2, at 54 (emphasis added).) Actual deception is required to support a Lanham Act false-advertising claim based upon misleading statements, and WIN has not alleged that any party was *actually* deceived by the statements in the April 1, 2020 letter. Thus, the proposed amendment is futile to the extent it is based on the allegedly misleading or "impliedly false" statements because the proposed amended counterclaim does not state a false-advertising claim based on these statements. Accordingly, the Court will **DENY IN PART** WIN's motion to the extent it seeks to amend its counterclaim to include the allegations relating to the allegedly misleading statements.

By contrast, the proposed amendments concerning the statements that WIN alleges are literally false are not futile. ACT argues that these statements do not support a false-advertising claim, because they are "contentions" rather than "facts." (Doc. 389, at 8.) For example, ACT argues that "ACT's statement that Arizona is infringing its copyrights is not a factual statement; it is a legal contention." (*Id.* (ACT then asserting that the statement "is not false; it is true").) It is true that Lanham Act false-advertising claims concern false or misleading descriptions or representations "of fact." 15 U.S.C. § 1125(a)(1). However, the statute limits claims to those based on statements of fact as opposed to statements of *opinion*, not as opposed to legal conclusions. *See Podiatric Physicians*, 185 F.3d at 614 ("[A] Lanham Act claim must be based upon a statement of fact, not of opinion." (citing *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995); *Gillette Co. v. Norelco Consumer Prods. Co.*, 946 F. Supp. 115, 136 (D. Mass. 1996)); *see also Groden*, 61 F.3d at 1051–52 (summarizing that statements of fact, which

can violate the Lanham Act, are generally "provable" and "verifiable," whereas statements of opinion, which cannot violate the Lanham Act, are subjective, imprecise, and cannot be proven true or false). ACT conflates the Lanham Act's specification of "fact" versus "opinion" with Rule 12(b)(6)'s specification of "factual allegations" versus "legal conclusions." (*See* Doc. 389, at 8–9.) Statements about the status of a case or one's intellectual-property rights are not necessarily subjective opinions and are generally verifiable. Specifically, the relevant statements—"that Arizona is infringing ACT's copyrights and certification marks and that, assuming ACT has trademark rights in its alleged certification marks, holders of certificates issued in connection with WIN's assessments are willful infringers" (Doc. 375-2, at 51)—are provable. That a court of law need ultimately determine the truth or falsity of these statements does not render them "opinion" statements.

Further, to the extent ACT argues that WIN will not be able to prove falsity, "[t]he test for futility . . . does not depend on whether the proposed amendment could potentially be dismissed on a motion for summary judgment; instead, a proposed amendment is futile only if it could not withstand a Rule 12(b)(6) motion to dismiss." *Rose*, 203 F.3d at 421. Whether a particular statement is false is a question of fact. *Podiatric Physicians*, 185 F.3d at 615 n.2. For the sake of determining whether a proposed amendment could withstand a Rule 12(b)(6) motion, the Court assumes that all well-pleaded factual allegations are true. *Thurman*, 484 F.3d at 859. Thus, for the purpose of evaluating whether WIN's motion to amend is futile, the Court must assume that the allegedly false statements are indeed false, even though evidence may later show that they are not; the truth of the statements is ultimately a question for the jury.

<u>d.  Whether WIN has Alleged Causation and Harm</u>

ACT also contends that WIN's proposed amendment fails to allege causation or harm. (Doc. 389, at 11–13.)  To the extent this argument relates to the allegedly misleading or impliedly false statements, the Court has already determined that amendment based on those allegations is futile.  However, to the extent this argument relates to the statements WIN alleges are literally false, the argument fails.

Causation, for the sake of a Lanham Act false-advertising claim, concerns the elements of deception and injury.  *Podiatric Physicians*, 185 F.3d at 613.  "The deception element asks whether the defendant's misstatements caused the consumer to be deceived[,]" while "[t]he injury element asks whether the defendant's deception of the consumer caused harm to the plaintiff."  *Id.* at 613–14.  Deception is presumed for statements that are literally false, as WIN alleges some of the statements in the April 1, 2020 letter are.  *See id.* at 614.  Thus, WIN's proposed amended counterclaim adequately pleads deception, and the issue turns on whether WIN has adequately alleged injury and harm.

In general, a claimant must allege and later prove damages to succeed on a false-advertising claim.  *See Innovation Ventures, LLC v. Bhelliom Enters. Corp.*, 529 F. App'x 560, 566 (6th Cir. 2013) (hereinafter "*Bhelliom*").  However, the Sixth Circuit recognizes an exception to this rule in "instances of willful deception."  *Id.*  Willfulness includes both knowing and reckless behavior and requires at least that the party accused of false advertising acted despite "an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *See La.-Pac. Corp. v. James Hardie Bldg. Prods., Inc.*, 335 F. Supp. 3d 1002, 1016–17

(citations omitted). In such instances, damages are presumed.[3] *Bhelliom*, 529 F. App'x at 566. Notably, this presumption "extends only to cases of comparative advertising where the plaintiff's product was specifically targeted." *Id.* (citations and internal quotation marks omitted).

The allegations in the proposed amended counterclaim support applying the presumption in this case. First, the statements in the letter specifically target and refer to WIN's product. (*See* Doc. 375-2, at 51–54.) Second, WIN alleges that ACT knowingly and willfully made the allegedly false statements. (*Id.* at 53–54.) The allegations, taken as true, allow the Court to reasonably infer that ACT made the statements despite an obvious and unjustifiably high risk of harm to WIN. Further, WIN's false-advertising counterclaim also relies on statements from letters other than the April 1, 2020 letter. (*See* Doc. 375-2, at 51–56.) In Paragraph 332 of the proposed amended counterclaim, WIN states:

> WIN has suffered harm as a result of ACT's false statements. For example, multiple customer representatives have contacted WIN expressing concern about continuing to use WIN's products, and at least one representative stated that it had been instructed to stop training on WIN's career readiness credentials.

(*Id.* at 56.) Reading the proposed amended counterclaim as a whole, WIN has sufficiently alleged causation and damages.

### e.  Prudential Standing

ACT next argues that WIN lacks prudential standing to bring the amended counterclaim. (Doc. 389, at 13–15.) The "prudential-standing" inquiry deals with whether a party has statutory authority to bring a cause of action—in other words, whether that party "falls within the class of plaintiffs whom Congress has authorized to sue" under a particular statute (here, 15 U.S.C.

---

[3] The Court notes, however, that the presumption can be "overcome by evidence of no marketplace injury." *Bhelliom*, 529 F. App'x at 566. ACT is free to present or identify such evidence at trial.

§ 1125(a)).  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014).

To determine whether WIN has prudential standing to sue, it must "fall within the zone of

interests" of § 1125(a) and its injuries must have been proximately caused by violations of the

statute.  *Id.* at 129–32.

"[T]o come within the zone of interests in a suit for false advertising under § 1125(a), a

plaintiff must allege an injury to a commercial interest in reputation or sales."  *Id.* at 131–32

(noting that the prohibition on false-advertising advances the Lanham Act's goal of protecting

those engaged in commerce from "unfair competition" and that unfair competition concerns

injuries to reputation or sales).  ACT argues that WIN does not have an interest that falls within

the zone of interests the Lanham Act seeks to protect, because asserting intellectual-property

rights is not "false advertising."  (Doc. 389, at 15.)  However, as set forth above, the allegedly

false statements from the April 1, 2020 letter that WIN cites as the basis of its false-advertising

claim are specific statements and WIN does not take issue with the general assertion that ACT

has intellectual-property rights.

The proximate-cause prong deals with "whether the harm alleged has a sufficiently close

connection to the conduct the statute prohibits."  *Lexmark*, 572 U.S. at 133.  ACT also contends

that WIN has not satisfied the proximate-cause prong of the test announced in *Lexmark* because

WIN has not alleged any specific economic or reputational injury.  However, as stated above, the

proposed amended counterclaim includes the following allegations:

> WIN has suffered harm as a result of ACT's false statements.  For example,
> multiple customer representatives have contacted WIN expressing concern about
> continuing to use WIN's products, and at least one representative stated that it had
> been instructed to stop training on WIN's career readiness credentials.

(*Id.* at 56.)  Thus, WIN has alleged that it suffered a loss in reputation or sales as a result of the

allegedly false statements ACT made in its various letters.

Finally, ACT argues that WIN should not be allowed to amend its false-advertising counterclaim, because WIN lacks Article III standing.  (Doc. 389, at 24.)  To have constitutional standing under Article III, a claimant must meet certain minimum requirements.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  First, the claimant "must have suffered an 'injury in fact'— an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural' or "hypothetical[.]'" *Lujan*, 504 U.S. at 560.  "Second, there must be a causal connection between the injury and the conduct complained of[.]"  *Id.*  In other words "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id.* (citations, internal quotation marks, and alterations omitted).  Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision."  *Id.* at 561 (citations and internal quotation marks omitted).

ACT argues that WIN lacks Article III standing because it has not adequately alleged that it suffered an injury in fact.  (Doc. 389, at 24.)  However, as the Court has discussed, the allegations of ACT's willfulness in the proposed amended counterclaim support applying the presumption of damages.  *See supra* Section III.B.i.d.  Further, WIN has alleged that it:

> suffered harm as a result of ACT's false statements.  For example, multiple customer representatives have contacted WIN expressing concern about continuing to use WIN's products, and at least one representative stated that it had been instructed to stop training on WIN's career readiness credentials.

(Doc. 375-2, at 56.)  Although this paragraph is under the heading for WIN's intentional-interference-with-business-relations counterclaim, the Court construes the complaint in the light most favorable to the claimant when determining whether the complaint states a plausible claim

for relief. *Thurman*, 484 F.3d at 859. Construing the counterclaim in the light most favorable to WIN and assuming the truth of its factual allegation, the Court finds that WIN has pled that it suffered an injury in fact sufficient to confer Article III standing.

### ii. *Intentional-Interference-with-Business-Relations Counterclaim*

ACT also contends that WIN's proposed amendment to its intentional-interference-with-business-relations claim is futile. (Doc. 389, at 15–22.) In Tennessee,[4] a party claiming intentional interference with business relationships must show the following elements: (1) "an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons"; (2) "the [opposing party's] knowledge of that relationship and not a mere awareness of the [claimant's] business dealings with others in general"; (3) "the [opposing party's] intent to cause the breach or termination of the business relationship"; (4) "the [opposing party's] improper motive or improper means"; and (5) "damages resulting from the

---

[4] WIN purports to bring its intentional-interference-with-business-relations claim under Tennessee law, and ACT responds in accordance with Tennessee law, despite noting that it "does not concede that Tennessee law applies and refers to it only for this motion." (*See* Doc. 376, at 6; Doc. 389, at 15 n.5.) Neither party, however, raises any choice-of-law arguments or suggests that another state's law governs this claim. To the extent there is a choice-of-law issue, the Court applies the conflict-of-law rules of the forum in which it sits, Tennessee. *Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 738 (6th Cir. 1999). In tort cases, Tennessee follows the "most significant relationship" test outlined in the Restatement (Second) of Conflict of Laws. *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992). Under this test, the law of the state in which the injury occurred applies unless some other has a more significant relationship to the controversy. *Id.* at 57. Here, it is unclear where the injury "occurred." Presumably the letter was received by the State of Arizona in Arizona, though this is not mentioned by either party. Even so, WIN alleges that other similar letters were sent to other states, including Kentucky and South Carolina. (Doc. 375-2, at 52.) Additionally, neither party indicated where the letter was written or sent from or where the relevant business relationship between WIN and its customers is centered. Because the parties have not briefed the issue, the Court has no basis to determine that any other state has a more significant relationship with the claim than Tennessee, the state where WIN is incorporated and from which it operates. Thus, for the purposes of analyzing this motion, the Court will apply Tennessee law. To the extent that Arizona law—or Kentucky or South Carolina law—is more appropriate, the parties may raise this argument in connection with their proposed jury instructions.

tortious interference." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). ACT argues that WIN has failed to adequately plead the fourth and fifth elements of its claim. (*See* Doc. 389, at 16–22.)

### a. Whether WIN has Alleged Improper Motive or Means

Whether a party acted with an improper motive or by an improper means "is dependent on the particular facts and circumstances" of the case." *Trau-Med*, 71 S.W.3d at 701 n.5. Though there is no precise definition of "improper" as it relates to this element, a party claiming intentional interference with business relationships must show that the opposing party's "predominant purpose" was to injure the claimant. *Id.* Further, "improper means" include means "that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition," in addition to "those means that are illegal or independently tortious." *Id.*

ACT argues that it should enjoy a "competitor privilege" with regard to its motive in sending the letter. (Doc. 389, at 17.) The Court has already discussed the possibility of such a privilege at length in addressing a prior motion for summary judgment. (*See* Doc. 316, at 76–77.) The Court need not repeat its analysis from that opinion or determine whether Tennessee law recognizes a competitor's privilege, because "even if a competitor enjoys a privilege that negates the improper motive requirement, it is not insulated from liability if the other requirement is present, i.e., improper means." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 184–85 (Tenn. Ct. App. 2007) ("The competitor's privilege does not apply to prevent liability based on wrongful means, methods, or conduct."). Here, WIN has alleged that ACT used improper means—namely, false statements, which are independently tortious—to interfere with WIN's business relationships. (Doc. 375-2, at 55.) These allegations,

discussed above, are sufficient to allow WIN's proposed amendment to survive a Rule 12(b)(6) motion, and the amendment is not rendered futile by any failure to plead improper motive or means.

### b.  Whether WIN's Proposed Amendments are Preempted

ACT also argues that WIN's proposed amendments are futile because WIN's intentional-interference-with-business-relations counterclaim is preempted by federal copyright and trademark law.  (Doc. 389, at 18–19.)  This argument fails for multiple reasons.  First, ACT provides no direct authority for its contention that federal copyright and trademark law preempt WIN's state-law claim.  Rather, ACT relies on a Michigan district court case and a case from the Federal Circuit that hold that federal *patent* law preempts state tort liability based on cease-and-desist letters.  (*Id.* at 19.)  ACT essentially restates its argument that cease-and-desist letters are "privileged" from serving as the basis of liability based on patent-law cases and federal authorization of "notice" of copyright and trademark rights.  *See supra* Section III.B.i.b.  Again, ACT has failed to identify a reasonable connection between the statutory authority to place notice of protection on copyrighted or trademarked materials and the preemption of a state-law intentional-interference-with-business-relations claim.  Second, WIN's counterclaim is not solely based on the allegedly false statements in the April 1, 2020 letter.  (*See* Doc. 375-2, at 54–56.)  For example, WIN's also bases its claim on statements in the June 26, 2018 and June 27, 2018 letters.  (*See id.*)  WIN's counterclaim for intentional-interference-with-business-relations is not preempted by federal copyright or trademark law.

### c.  Whether WIN's Proposed Amendments are Barred by the *Noerr-Pennington* Doctrine

Next, ACT argues that the *Noerr-Pennington* doctrine renders WIN's proposed amendments futile.  (Doc. 389, at 20.)  "The *Noerr–Pennington* doctrine, which derives from

*United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), and *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), protects persons from liability in their efforts to enforce their First Amendment rights to petition the government and to petition the courts for judicial relief." *DIRECTV, Inc. v. Rayborn*, No. 5:03-CV-59, 2003 WL 23200248, at *6 (W.D. Mich. Oct. 20, 2003) (citing *Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir.1989)). The doctrine was developed in the context of antitrust law, but courts have since expanded its application to include other claims, including state-law claims, in the interest of preserving First Amendment protections. *See id.* (collecting cases). Although initially concerned with protecting parties from liability that could be incurred by using litigation to enforce their rights, courts have also applied the doctrine to protect pre-litigation activities, including cease-and-desist letters. *Id.*

The protections of the *Noerr-Pennington* doctrine, however, do not apply to "sham" litigation. See *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993). For a lawsuit to qualify as a "sham," it must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* at 60. "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*[.]" *Id.* After it is shown that a suit is objectively baseless, the court may examine the litigant's subjective motivation to determine whether the suit "conceals an attempt to interfere directly with the business relationships of a competitor through the use of governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Id.* at 60–61 (citations, alterations, and internal quotation marks omitted).

ACT contends that the *Noerr-Pennington* doctrine shields it from liability for any harm caused by the April 1, 2020 letter because it is a cease-and-desist letter to the State of Arizona. (Doc. 389, at 20–21.)  WIN argues that the threatened litigation against Arizona falls under the sham-litigation exception because, WIN contends, states are immune from copyright lawsuits. (Doc. 391, at 4 n.2.)  WIN bases its argument on the Supreme Court's recent decision in *Allen v. Cooper*, 140 S. Ct. 994 (2020).  (*See* Doc. 376, at 3.)  In *Allen*, the Supreme Court held that the Intellectual Property Clause does not give Congress the authority to abrogate state sovereign immunity for copyright violations, and, thus, "the power to 'secur[e]' an intellectual property owner's 'exclusive Right' under Article I stops when it runs into sovereign immunity."  *Allen*, 140 S. Ct. at 1002 (quoting U.S. Const. § 8, cl. 8).  Although *Allen* does not speak to whether any states have waived their sovereign immunity for copyright violations, Ninth Circuit jurisprudence suggests that Arizona has not done so.  *See, e.g.*, *Mills Music, Inc. v. State of Ariz.*, 591 F.2d 1278, 1282 (9th Cir. 1979) (noting that "such a waiver is not to be lightly inferred" and declining to find that Arizona had waive its immunity from suit for copyright violations despite the State having answered a complaint containing allegations of infringement).

Thus, the *Noerr-Pennington* doctrine does not protect ACT from liability for its letter to the State of Arizona, because ACT has not demonstrated that it could realistically expect to succeed in a suit for copyright-infringement against Arizona.

### d.   Whether WIN has Alleged Damages

ACT further argues that WIN has not alleged harm or that ACT caused any harm WIN may have suffered.  (Doc. 389, at 22.)  ACT contends that "WIN essentially alleges that its customer's knowledge of WIN's infringement and breach of the terms and conditions of its agreement with Arizona may affect WIN's relationship with Arizona."  (*Id.*)  However, WIN

alleges that the negative response from customers was caused by ACT's false statements rather than the status of this litigation or WIN's use of ACT's copyrighted materials. (*See* Doc. 375-2, at 50–56.) For example, WIN alleges that in a letter dated June 26, 2018, ACT falsely stated "(1) that the ACT WorkKeys system will not work with other assessments; (2) that WorkKeys does not work interchangeably with WIN's assessments; (3) that WIN does not have a component that matches job profiling; and (4) WIN's claims that its assessments 'align' with ACT's WorkKeys assessments are false." (*Id.* at 50.) These statements could certainly have caused WIN's customers concern and/or damaged WIN's relationships with its clients, and both WIN and ACT will have the opportunity at trial to persuade the jury as to the true cause of any harm experienced by WIN. In addition, the Court can reasonably infer from WIN's allegations regarding the concern and confusion of its customers that WIN suffered some reputational harm due to ACT's actions.

### e.   Article III Standing

ACT also contends that WIN lacks Article III standing with respect to its intentional-interference-with-business-relations counterclaim—specifically, that WIN has not alleged causation or injury in fact. (Doc. 389, at 25–26.) ACT argues that receiving questions or concerns from its customers does not amount to actual harm. (*Id.*) In addition, ACT again asserts that any concerns of WIN's customers were caused by WIN's infringing actions rather than ACT's letters. (*Id.* at 25.)

Concerning whether WIN has alleged an injury in fact, WIN has alleged facts that support the reasonable inference that, at the very least, its reputation amongst its customers was harmed. "Reputational injury . . . is sufficient to establish injury in fact." *Parsons v. U.S. Dept.*

*of Justice*, 801 F.3d 701, 711 (6th Cir. 2015) (collecting cases). WIN does not lack standing merely because it has not identified a dollar-amount lost due to ACT's allegedly false statements.

Concerning causation, WIN has alleged that the response from customers was due to the false statements contained in the letters rather than WIN's own actions. (*See* Doc. 375-2, at 50–56.) As discussed above, these statements could have damaged WIN's relationships with its clients, and WIN has sufficiently alleged that ACT's actions were the cause of WIN's loss.

## IV. CONCLUSION

For the reasons set forth above, WIN's motion is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. WIN's motion is **GRANTED** to the extent that WIN seeks to add allegations in support of its false-advertising counterclaim concerning statements in the April 1, 2020 letter that WIN alleges are literally false **and** to the extent WIN seeks to add allegations in support of its intentional-interference-with-business-relations counterclaim.

2. WIN's motion is **DENIED** to the extent that WIN seeks to add allegations concerning "implied statements" that are "false or misleading" to support its false-advertising counterclaim. Specifically, WIN's motion is **DENIED** to the extent it seeks to add paragraphs 310, 317, and the portion of paragraph 320 that reads:

   > ACT's false and misleading implied statements regarding WIN's assessments infringing ACT's copyrights are likely to mislead the public into believing that WIN's assessments violate ACT's copyrights, when such is not the case, and that it is therefore advantageous to WIN's customers to discontinue their business relationships with WIN and become customers of ACT, when such is not the case.

It is also **ORDERED** that no additional discovery shall be allowed in this case. However, the parties may each amend their pretrial disclosures and final witness lists **once** to allow for any adjustments warranted by the limited additional factual allegations. Any such amendments **SHALL** be filed no later than **July 27, 2020**. Finally, the Court will **NOT** permit any further Rule 12(b)(6) motions related to the amendments allowed by this order; the parties have already

briefed these issues with regard to futility of amendment and the Court has already determined

that the proposed amended counterclaim states a claim for relief.

**SO ORDERED.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**