# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  August 23, 2022

Mr. A. Mattison Bogan
Nelson, Mullins, Riley & Scarborough
P.O. Box 11070
Columbia, SC 29211

Mr. William Kyle Carpenter
Law Office
P.O. Box 900
Knoxville, TN 37920

Ms. Laura Lindsay Chapman
Ms. Yasamin Parsafar
Sheppard, Mullin, Richter & Hampton
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111

Mr. Matthew G. Halgren
Sheppard, Mullin, Richter & Hampton
501 W. Broadway, 19th Floor
San Diego, CA 92101

Mr. James Chadwick Hatmaker
Woolf, McClane, Bright, Allen & Carpenter
P.O. Box 900
Knoxville, TN 37902

Mr. John G. Jackson
Mr. Hugh J. Moore Jr.
Chambliss, Bahner & Stophel
605 Chestnut Street, Suite 1700
Chattanooga, TN 37450

Mr. Lorin Lapidus
Nelson Mullins Riley & Scarborough
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103

Re:     Case Nos. 21-5889/21-5907/21-6155, *ACT, Inc. v. Worldwide Interactive Network, et al.*
        Originating Case No. : 3:18-cv-00186

Dear Counsel,

    The court today announced its decision in the above-styled case.

    Enclosed is a copy of the court's published opinion together with the judgment which has
been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                                    Yours very truly,

                                    Deborah S. Hunt, Clerk


                                    Laurie A Weitendorf
                                    Deputy Clerk

cc:  Ms. LeAnna Wilson

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0200p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ACT, INC.,

*Plaintiff-Appellee,*

*v.*

WORLDWIDE INTERACTIVE NETWORK, INC.; TERESA CHASTEEN,

*Defendants-Appellants.*

Nos. 21-5889/5907/6155

─────────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:18-cv-00186—Travis Randall McDonough, District Judge.

Argued: June 9, 2022

Decided and Filed: August 23, 2022

Before: WHITE, BUSH, and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Lorin J. Lapidus, NELSON MULLINS RILEY & SCARBOROUGH LLP, Winston-Salem, North Carolina, for Appellants. Laura L. Chapman, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, San Francisco, California, for Appellee. **ON BRIEF:** Lorin J. Lapidus, NELSON MULLINS RILEY & SCARBOROUGH LLP, Winston-Salem, North Carolina, A. Mattison Bogan, NELSON MULLINS RILEY & SCARBOROUGH LLP, Columbia, South Carolina, W. Kyle Carpenter, WOOLF, MCCLANE, BRIGHT, ALLEN & CARPENTER, Knoxville, Tennessee, for Appellants. Laura L. Chapman, Yasamin Parsafar, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, San Francisco, California, Matthew G. Halgren, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, San Diego, California, for Appellee.

_____

## OPINION

_____

JOHN K. BUSH, Circuit Judge.  Before us are two appeals that arise from the same intellectual-property dispute.  Relevant to both, the testing company ACT, Inc. ("ACT") asserts that its former-partner-turned-competitor, Worldwide Interactive Network, Inc. ("WIN"), infringed ACT's copyright in its "Skill Definitions."  Skill Definitions are, in essence, descriptions of the various workplace skills that ACT intends to test with its career-readiness assessments. ACT markets those assessments to schools, workplaces, and state departments of education.

After the parties' relationship soured, WIN began to market its own career-readiness assessments that purported to test various "Learning Objectives"—descriptions of workplace skills suspiciously similar to ACT's Skill Definitions.  In response, ACT filed suit.  The district court awarded partial summary judgment to ACT on its copyright-infringement claims and later preliminarily enjoined WIN from continued infringement.  WIN's first appeal concerns the imposition (and scope) of that preliminary injunction.  Finding WIN's objections unpersuasive, however, we affirm.

We then turn to WIN's second appeal, which concerns a distinct but related issue.  After WIN began to infringe ACT's Skill Definitions once again with a set of "revised" Learning Objectives, the district court ordered ACT to amend its complaint with new allegations that the revised Learning Objectives are likewise infringing.  In response to the amended complaint, WIN filed an amended answer asserting a never-before-offered defense: that because WIN designed the Learning Objectives to bid on various state contracts, it was entitled to assert those states' sovereign immunity from the copyright claims—so-called "derivative sovereign immunity."  *See* Am. Answer ¶¶242–44, R. 551.  But the district court struck the new defense as both untimely and "frivolous."  Relying on the timeliness ground alone, we affirm that decision as well.[1]

_____

[1]Separately, we deny ACT's motion, ECF No. 34, to supplement the record on appeal.

## I.

ACT has long published a product called "WorkKeys"—"a system of workforce-development assessments that measure skills affecting job performance."  Op. at 2, R. 316. "Three of those assessments are relevant to this case: Applied Mathematics, Locating Information, and Reading for Information."  *Id.*  Also relevant—indeed, the crux of this dispute—are the various "Skill Definitions" corresponding to those assessments.  "Skill Definitions"—published by ACT in technical manuals accompanying the assessments—are essentially descriptions of the skills tested by each respective assessment.

For many years, ACT collaborated with WIN to promulgate those assessments.  The parties had an "ongoing business relationship" from 1997 to 2011, Am. Answer ¶147, R. 120, and specifically entered a "WorkKeys Publisher Agreement" in 2006, Op. at 5, R. 316.  Under that agreement, ACT designated WIN a "Preferred Content Provider" "with authority to develop and sell WorkKeys curricula in exchange for the payment of annual fees and royalties to ACT." *Id.*  As part of that agreement, WIN also stipulated that ACT had the exclusive right to distribute WorkKeys materials and to prepare derivative works based on the same.  ACT thus provided WIN "much information related to WorkKeys," including its tables of Skill Definitions from its technical manuals.  *Id.*  ACT "periodically reviewed" WIN's curricula "to ensure alignment between [WIN's] product[s] and ACT's WorkKeys."  *Id.*

After disagreements arose, however, "[t]he contractual relationship between WIN and ACT terminated in 2011."  *Id.* at 7.  Thus, WIN and its president, Teresa Chasteen, began to develop and promote their own career-readiness-assessment materials.

Following a period of apparently peaceful coexistence, WIN and ACT found themselves at odds yet again over a contract with the state of South Carolina, this time in mid-2018.  For about a year before, ACT had contracted with the South Carolina Department of Education and Workforce "to provide its WorkKeys assessments to employers within the state."  *Id.*  But the state later issued a "request for proposal" soliciting competing bids for new assessments.  *Id.*  After both ACT and WIN bid on the contract, the state awarded it to WIN.  A review of the "Test Blueprint" WIN submitted during the bidding revealed that its "Learning Objectives" for the

Applied Mathematics, Locating Information, and Reading for Information assessments were virtually indistinguishable from ACT's Skill Definitions.

ACT sued in response, asserting several claims against WIN. One was copyright infringement, predicated on ACT's claim that WIN directly copied its "Learning Objectives" from ACT's Skill Definitions, which ACT furnished to WIN under the parties' former contract. Despite WIN's defenses, the district court granted partial summary judgment to ACT on the copyright claims in March 2020. The parties anticipated going to trial on the other claims soon after, but the COVID-19 pandemic caused a series of prolonged delays.

In the interim, WIN sought to salvage its original Learning Objectives by enlisting an education consultant, Amy Burkam, to make several revisions. WIN claims that Burkam's revisions—which resulted in, fittingly, the revised Learning Objectives—do "not infringe upon the description, selection, or arrangement of ACT's Skill Definitions." Appellants' Br. [21-5889] at 10. But ACT disagreed, so it voiced its objections to the revised Learning Objectives at a pretrial conference in July 2021. Acting *sua sponte*, the district court ordered ACT to amend its complaint to include new allegations about the revised Learning Objectives—an amendment ACT contends was unnecessary, since the extant complaint already put WIN on notice that the revised Learning Objectives were also infringing.

ACT complied nonetheless, amending its complaint with the new allegations. But soon after, WIN tried to assert a never-before-raised defense in its amended answer: derivative sovereign immunity. According to WIN, because it had submitted bids on various state contracts, it was entitled to derivatively assert those states' sovereign immunity from suit. ACT objected, however, and the district court struck the new defense, reasoning that it was both untimely and "frivolous." Order at 3–4, R. 605.

ACT then moved the district court to enjoin WIN's infringement. The district court entered a preliminary injunction in August 2021. Its order restrains WIN "from knowingly infringing ACT's copyrights in its Skill Definitions, including by distributing, copying, reproducing, displaying, creating derivative works from, or engaging in any other activity deemed infringing by 17 U.S.C. § 106 involving ACT's Skill Definitions." Op. & Order at 27,

R. 541.  And, in a subsequent order, the district court clarified that this injunction bars WIN from distributing not only the original and revised Learning Objectives, but WIN's corresponding assessments as well.

These interlocutory appeals followed.  In the first, defendants WIN and Chasteen contest the district court's grant of a preliminary injunction.  They argue that the district court misapplied all four of the preliminary-injunction factors—in particular, that it erred in deeming WIN's original and revised Learning Objectives infringing and that it merely presumed rather than actually found irreparable harm to ACT.

In the second, WIN and Chasteen object to the district court's decision to strike its novel derivative-sovereign-immunity defense.  The defense was timely raised, they argue, because it was unavailable before the Supreme Court's decision in *Allen v. Cooper*, 140 S. Ct. 994 (2020), which held that Congress has not validly abrogated states' sovereign immunity from copyright claims.  *Id.* at 1007.  And *Allen* only emerged long after defendants had filed the previous version of their answer.  Likewise, they contend that the defense is not the sort of "redundant, immaterial, impertinent, or scandalous matter" that may be stricken under Rule 12(f) of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 12(f).

## II.

We first examine our jurisdiction and standards of review before explaining why both of WIN's appeals lack merit.  As to the first, we have jurisdiction over the preliminary-injunction orders via 28 U.S.C. § 1292(a).  *See* 28 U.S.C. § 1292(a)(1) (providing appellate-court jurisdiction over "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions").  We also have pendent-appellate jurisdiction over the district court's earlier partial-summary-judgment order on ACT's copyright claims.  The district court relied extensively on its infringement analysis from that order in determining whether to grant a preliminary injunction.  *See, e.g.*, Op. & Order at 3, 13, R. 541. Indeed, if the copyright analysis is wrong in the summary-judgment order, it is necessarily wrong in the preliminary-injunction order.  Thus, those orders are inextricably intertwined, and review of the summary-judgment order is necessary to ensure meaningful

review of the preliminary-injunction order.  *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995).

As to the second appeal, we have jurisdiction under 28 U.S.C. § 1291 and the collateral-order doctrine.  Section 1291 authorizes appellate-court jurisdiction over the "final decisions of the district courts."  28 U.S.C. § 1291.  And under the collateral-order doctrine, we treat interlocutory decisions as "final" when they involve a "conclusive" decision on an important issue separate from the merits that is "effectively unreviewable" on appeal from a final judgment.  *Swint*, 514 U.S. at 42; *see also Black v. Dixie Consumer Prods. LLC*, 835 F.3d 579, 582 (6th Cir. 2016).  The interlocutory order that WIN claims is otherwise unreviewable is the district court's denial of its assertion of derivative sovereign immunity.  Whether the denial of that immunity is immediately appealable hinges on what we believe it an immunity from.  *Black*, 835 F.3d at 582.  ACT claims the "immunity" is really a mere defense to liability.  If that were the case, it would render the denial effectively *reviewable* on appeal from a final judgment, and thus outside the collateral-order doctrine.  *See, e.g.*, *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 145 (1993).  After all, if the district court erroneously entered relief against WIN, we could simply reverse the decision on appeal.

WIN, by contrast, claims that the asserted immunity is an immunity from suit itself.  Thus, it argues that the immunity denial is appealable now.  For if we were to wait and make WIN undergo further litigation, its purported immunity from suit would be irretrievably lost.  *See, e.g.*, Appellants' Br. [21-6155] at 3 (describing appellants' asserted "privilege not to stand trial in the first instance"); Reply Br. [21-6155] at 3 ("Defendants' derivative sovereign immunity defense insulates them from suit and not merely liability."); *cf. Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("[Qualified immunity] is an *immunity from suit*, rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

We lack on-point circuit precedent about the nature of derivative sovereign immunity—whether it is a true immunity from suit or merely a defense to liability.  And there appears to be no uniform answer to the related question of how to construe *federal* contractors' immunities.  *Compare In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 191–93 (2d Cir. 2008)

(concluding that because section 305 of the Stafford Act provides immunity from suit, there was jurisdiction "to determine the substantive question of whether that immunity may extend derivatively to non-federal entities working in cooperation with federal agencies under the Stafford Act"), *and McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1339–40, 1343 (11th Cir. 2007) (concluding that there was jurisdiction over the district court's denial of derivative immunity claimed to arise from *Feres v. United States*, 340 U.S. 135 (1950)), *with Childs v. San Diego Fam. Hous. LLC*, 22 F.4th 1092, 1097 (9th Cir. 2022) (concluding that the denial of derivative sovereign immunity is not immediately appealable for the same reasons that, under Ninth Circuit precedent, denial of sovereign immunity is not immediately appealable), *and Martin v. Halliburton*, 618 F.3d 476, 484–85 (5th Cir. 2010) (concluding that, under Fifth Circuit precedent, the denial of derivative sovereign immunity is not immediately appealable under the collateral-order doctrine).

We ultimately agree with WIN, however, that the immunity denial here is immediately appealable, since the relevant immunity is one from suit. A few reasons motivate that conclusion. First, we have explained before that the immunity government contractors enjoy derives from whatever immunity the relevant government would have "in the same situation."[2] *Adkisson v. Jacobs Eng'g Grp.*, 790 F.3d 641, 645 (6th Cir. 2015). Second, no one disputes that "in the same situation," *id.*—a lawsuit for copyright infringement—states would enjoy an immunity from suit itself, the denial of which would be immediately appealable. *See Allen*, 140 S. Ct. at 1007; *Puerto Rico Aqueduct & Sewer Auth.*, 506 U.S. at 145; *Lowe v. Hamilton Cnty. Dep't of Job & Fam. Servs.*, 610 F.3d 321, 323 (6th Cir. 2010) ("Because sovereign immunity is an immunity from trial, . . . the denial of a claim of sovereign immunity is immediately appealable under the collateral order doctrine as a final decision . . . ." (internal quotation marks omitted)). And third, ACT has identified no waivers from the relevant states—South Carolina,

---

[2]To be clear, however, our statement that contractors' immunity derives from the relevant sovereign's immunity "in the same situation" does not mean that the contractor's immunity functions *exactly* the same as would the sovereign's immunity. For instance, we have explained that contractors' immunity is not jurisdictional, as might be, for instance, a state's immunity under the Eleventh Amendment. *Adkisson*, 790 F.3d at 647; *see also* U.S. Const. amend. XI. And the Supreme Court has described federal contractors' immunity as "qualified," given that its applicability hinges on whether the contractor was closely following the government's precise instructions. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166–67 (2016). Contractors enjoy no derivative immunity, in other words, for acts that deviate from those instructions.

Kentucky, Arizona, and Florida—disclaiming immunity for themselves or their contractors. To the contrary, these states have codified *reservations* of their own immunities from suit in federal court. *See* S.C. Code Ann. § 15-78-20(e); Fl. Stat. Ann. § 768.28(18); Ky. Rev. Stat. § 49.060; Ariz. Rev. Stat. § 12-820.05 (describing immunity from tort suits). Thus, we believe the denial of contractor immunity immediately appealable where, as here, state contractors purport to enjoy the same immunity as would the relevant states, the relevant states would themselves enjoy immunity from federal suit, and no on-point statute or precedent explains otherwise.

We turn now to the relevant standards of review. To obtain a preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The ultimate decision to grant an injunction is reviewed for an abuse of discretion." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017). But we "examine legal questions de novo and findings of fact for clear error." *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 536 (6th Cir. 2020). Copyrightability is either a mixed question of law and fact or a pure question of law, so in any event should be reviewed *de novo*. *See Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1353 n.3 (Fed. Cir. 2014); *see also Tri Cnty. Wholesale Distribs., Inc. v. Labatt USA Operating Co.*, 828 F.3d 421, 430 (6th Cir. 2016).[3] An alleged infringer's access to an original work, however, is an essentially factual question, so our review is for clear error. *See Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) (explaining that access is a factual question meriting clear-error review); *Sarkadi v. Wiman*, 135 F.2d 1002, 1003 (2d Cir. 1943) (same).

---

[3]Technically, the Supreme Court has held that mixed questions warrant *de novo* review when they concern mainly issues of law and deferential review when they concern mainly issues of fact. *See U.S. Bank. Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 966–67 (2018). Here, it seems that to the extent copyrightability could be understood as a mixed question at all, *de novo* review is warranted. The parties do not dispute the content of ACT's Skill Definitions or of WIN's Learning Objectives. The dispute is instead largely legal: whether the Skill Definitions' uncontested content qualifies for copyright protection under federal law. To resolve this appeal, we need not decide whether *de novo* review is warranted in *all* copyrightability disputes. *See Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 480–81 (6th Cir. 2015) (noting the circuit split on this issue but treating copyrightability as a question of law after explaining the lack of disagreement about the underlying facts in the case at hand).

As for the immunity defense, Rule 12(f) authorizes district courts to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). But "[m]otions to strike are viewed with disfavor and are not frequently granted." *Operating Eng'rs Loc. 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015). Indeed, "federal courts are very reluctant to determine disputed or substantial issues of law on a motion to strike; these questions quite properly are viewed as best determined only after further development by way of discovery and a hearing on the merits." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1381 (3d ed. Apr. 2022 update) (footnote omitted). A decision on a motion to strike is ultimately reviewed for an abuse of discretion, though constituent legal decisions are reviewed *de novo. See Operating Eng'rs Loc. 324 Health Care Plan*, 783 F.3d at 1050.

## III.

We consider first whether the district court abused its discretion in imposing, or imposed an overly broad, preliminary injunction. We then turn to whether the district court properly struck the derivative-sovereign-immunity defense.

### A.    *ACT's Likelihood of Success in Establishing Copyright Infringement*

"To succeed in a copyright infringement action, a plaintiff must establish that he or she owns the copyrighted creation, and that the defendant copied it." *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003). But not all copying is actionable. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Rather, copyright protection extends "only to those components of a work that are original to the author"—those components "independently created" and that possess "some minimal degree of creativity." *Id.* at 348, 345. Thus, in assessing whether copying is actionable, courts must "identify and eliminate those elements that are unoriginal and therefore unprotected." *Kohus*, 328 F.3d at 853.[4]

---

[4]We note, as does ACT, that substantial-similarity analysis is not relevant here because there is direct evidence of copying. *See* Appellee's Br. [21-5889] at 43. Substantial similarity matters in the *absence* of direct evidence of copying, as it creates an inference that the defendant copied the plaintiff's work. *See Jones v. Blige*, 558 F.3d 485, 490–91 (6th Cir. 2009).

Here, WIN does not dispute that ACT registered its copyrights in the Skill Definitions. *See* Appellants' Br. [21-5889] at 8.[5] WIN also had direct access to the Skill Definitions through the parties' former contract, as the district court correctly found. *See* Op. & Order at 12–13, R. 541. And WIN admits to copying the Skill Definitions when creating the original Learning Objectives. *See id.* at 13–14; Reply Br. at 12. Its argument instead focuses on its contention that the Skill Definitions—in particular, their "description," "selection," and "arrangement"—are not creative or original to ACT, and thus are not copyrightable. *See* Appellants' Br. [21-5889] at 27–35. Rather, says WIN, the Skill Definitions' expression merges with the underlying ideas, and their selection and arrangement represent merely an uncopyrightable system of skills testing. We address those points in turn.

### 1. *"Selection" vs. "Description" vs. "Arrangement" of Skills*

The first critical task here is deciphering what ACT means when it uses the term "Skill." As we understand it, there are three "Skills" relevant to this lawsuit—Locating Information, Reading for Information, and Applied Mathematics. *See, e.g.*, Appellee's Br. [21-5889] at 15. Those "Skills" are then defined (that is to say, their "Skill Definitions" consist of) all the various "subskills" listed under the relevant skill category, which themselves are grouped by different levels of difficulty. *See id.* For instance, the "Skill" of Reading for Information would be defined as exhibiting competency in all the various "subskills" listed within that Skill Definition. (For an example, see Appendix A to this opinion.) Understanding these various distinctions is key, as each aspect of what ACT asserts is copyrightable merits its own analysis.[6]

---

[5]Registration can raise a presumption of validity, *Varsity Brands*, 799 F.3d at 477 (citing 17 U.S.C. § 410(c)), though the district court did not rely on it in determining that ACT's material is copyrightable, *see* Op. at 12, R. 316. More importantly, registration is generally required to sue over alleged copyright infringement. *See* 17 U.S.C. § 411(a); *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 887 (2019).

[6]The district court appears at times to have defined "Skill" differently, stating that "[t]he skills identified include, for example, 'add, subtract, multiply, and divide whole numbers, decimals, and fractions accurately,' and 'problem solving.'" Op. at 41, R. 316; *see also* Op. & Order at 18, R. 541 (listing "the following skills to be tested," including "Decide what information, calculations, or unit conversions to use to solve the problem" and "Calculate percentage discounts or markups"). We, by contrast, refer to these more specific tasks as "subskills." Of course, the choice of terminology has no bearing on the outcome.

### 2.  *ACT's Selection of the Skills is Likely Not Copyrightable*

Thus understood, ACT's mere "selection" of its three Skills—its decision to test the fields of Locating Information, Reading for Information, and Applied Mathematics—is likely unprotectable.  ACT claims that it invested much thought and labor in its decisions to test these three skills.  But there is no labor theory of copyright.  *See Feist Publ'ns, Inc.*, 499 U.S. at 359–60 (explaining that "the 1976 revisions to the Copyright Act leave no doubt that originality, not 'sweat of the brow,' is the touchstone of copyright protection" for fact-based works).  Rather, copyright affords protection only to an author's *expression* of a system—not the system itself. *See Baker v. Selden*, 101 U.S. 99, 101–02 (1879); *see also RJ Control Consultants, Inc. v. Multiject, LLC*, 981 F.3d 446, 455 (6th Cir. 2020).  And the short phrases used to label ACT's skills—"Locating Information," "Reading for Information," and "Applied Mathematics"— warrant no protection either.  These are simply non-creative descriptions of the relevant fields. *See Hiller, LLC v. Success Grp. Int'l Learning All., LLC*, 976 F.3d 620, 628 (6th Cir. 2020).  So WIN or some other company would be free to independently design an assessment program that happened to test these skills, even if it got the *idea* of testing them from ACT.

### 3.  *ACT's Description of the Skills Likely is Protectable*

ACT's *description* of the Skills, by contrast, likely is protectable.  Again, ACT seems to define its "description" of the Skills as its collective expression of all the various "subskills" tested to assess competency in the overall Skill.  *See* Appellee's Br. [21-5889] at 15.  In reference to Appendix A, for example, ACT's "description" of the Skill of Reading for Information is its expression of the twenty-two various subskills pertinent to that Skill.

*That* collective description of a "Skill" via the compilation of the various subskills, as the district court correctly held, is protectable under copyright law.  As the Supreme Court has explained, "the requisite level of creativity" required to secure a copyright is "extremely low," and even a "crude, humble or obvious" degree of creativity suffices.  *Feist Publ'ns, Inc.*, 499 U.S. at 345. ACT's decision to compile all of its particular subskills into the Skill Definitions was not inevitable, as ACT points out, and one could imagine different collective descriptions of the various Skills.

In response, WIN asserts that ACT cannot claim copyright protection in the expression of each constituent "subskill" in the Skill Definitions. WIN's argument is likely strongest in the context of "Applied Mathematics," given the few ways to express discrete mathematical procedures. For instance, one of the listed "subskills" is to "[d]ivide negative numbers," while another is to "[m]ultiply negative numbers." *See* Appendix A. It is difficult to understand how the expression "divide negative numbers" manifests any degree of creativity beyond merely describing the phenomenon of dividing negative numbers, and so here fact and expression merge. *See, e.g.*, *Hiller, LLC*, 976 F.3d at 628 ("Where the expression is essential to the statement of the idea, or where there is only one way or very few ways of expressing the idea, copyright protection does not exist because granting protection to the expressive component of the work necessarily would extend protection to the work's uncopyrightable ideas as well." (cleaned up)). Thus, ACT would be unlikely to succeed in showing the copyrightability of its phrasing of every subskill.

True, ACT might be able to establish copyright protection in how it expressed *some* of the subskills. For instance, some courts—in the testing context no less—have deemed certain "short, simple, declarative sentences" worthy of protection. *See, e.g.*, *Applied Innovations, Inc. v. Regents of Univ. of Minn.*, 876 F.2d 626, 635 (8th Cir. 1989) (collecting cases). But the more important point is that ACT's argument does not hinge on whether copyright protection extends to its expression of any individual subskill. Instead, its claim is that its *compilation* of the subskills into a coherent Skill Definition is what merits protection. *See, e.g.*, Appellee's Br. [21-5889] at 30–31 ("The question is not whether a short phrase or series of short phrases can be extracted from the work, but whether the manner in which they are used exhibits creativity."). And its claim to protection is likely to succeed, given the low creativity threshold described by the Supreme Court. *See Feist Publ'ns, Inc.*, 499 U.S. at 345. Indeed, *any* degree of creative arrangement will support a compilation copyright in the way the subskills are compiled. *See id.* ("[T]he requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be."). Thus understood, the district court correctly concluded that the Skills' "description"—in other words, ACT's creative choices in compiling all the various subskills—merits protection.

### 4.  *ACT's Arrangement of the Skills is Likely Protectable*

Likewise, ACT's arrangement of the subskills across skill levels in the Skill Definitions was also sufficiently creative to warrant copyright protection.  For instance, ACT made the non-obvious and non-inevitable decision to place the "Use the reading material to figure out the meaning of words that are not defined" subskill in Level 4 of the Reading for Information Skill Definition, rather than in Level 5.  *See* Appendix A.  And it made similar decisions when arranging all the various subskills.  As ACT points out, "[t]he skills and subskills could have been grouped in other ways, such as by field of work in which they are most useful[,] or by subtopic."  Appellee's Br. [21-5889] at 17.  Or "ACT could have designed the Skill Definitions to reveal aptitude in a particular subskill rather than a particular level of ability related to the general skill."  *Id.*  Its method of arranging the subskills, therefore, did not follow some blindingly obvious scheme (like alphabetization) that would have vitiated copyright protection.  *See Feist Publ'ns, Inc.*, 499 U.S. at 363.  It instead exhibits at least the minimal degree of creativity required to obtain a compilation copyright.  *See id.* at 345.

ACT is thus likely to succeed in showing that WIN's original and revised Learning Objectives infringe at least ACT's description and arrangement of its Skills and subskills.  The original Learning Objectives are virtually identical copies of ACT's Skill Definitions.  *See, e.g.*, Appendix A.  And the revised Learning Objectives preserve much of the same arrangement of subskills across different levels, while simply regurgitating the original Learning Objectives with slight rewording.  *See, e.g.*, Appendix B.  Yet such "immaterial variations" cannot insulate the revised Learning Objectives from infringement.  *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (L. Hand, J.) ("It is of course essential to any protection of literary property, whether at common-law or under the statute, that the right cannot be limited literally to the text, else a plagiarist would escape by immaterial variations.").  Indeed, as Appendix B reflects, WIN merely sought to conceal the revised Learning Objectives' origin with ultimately superficial wordsmithing.

> 5.  *WIN's Claim that the Revised Learning Objectives Did Not Copy from ACT's Skill Definitions*

Relatedly, WIN asserts that even if the *original* Learning Objectives are likely infringing, the *revised* Learning Objectives are not.  *See* Appellants' Br. [21-5889] at 35.  Its argument appears to be that, as to the revised Learning Objectives, "there is no direct evidence of copying." *Id.*  Thus, WIN claims, we must assess potential infringement with the substantial-similarity test.  *Id.* at 37.  And, WIN argues, because the revised Learning Objectives are supposedly dissimilar to ACT's Skill Definitions, they are not infringing.  *Id.*

We find no merit in WIN's contention that there is no evidence of direct copying.  The original Learning Objectives were copied from ACT, and the revised Learning Objectives are simply reworded versions of the original Learning Objectives.  Indeed, recall that after the district court awarded partial summary judgment to ACT on the copyright-infringement claims, WIN employed an education consultant, Amy Burkam, to edit the original Learning Objectives.  Her effort resulted in the revised Learning Objectives, which merely reworded the original Learning Objectives to obscure their status as direct copies of ACT's Skill Definitions.  Unsurprisingly, as the district court noted, WIN already admitted in its briefing below that the Revised Learning Objectives "were based on the substance of the original Learning Objectives." Op. & Order at 14, R. 541 (quoting Opp'n to Mot. for Permanent Injunction at 12, R. 534).  Directly copying the Skill Definitions in the original Learning Objectives and then rewording them to create the revised Learning Objectives does not prove that the revised Learning Objectives were not copied from the Skill Definitions.  They too were copies—just slightly modified copies.  Thus, as the district court held, ACT is likely to succeed on its copyright claim as to the revised Learning Objectives as well.

>  B.  *WIN's Contention that the District Court Erroneously Presumed Irreparable Harm*

WIN next asserts that rather than *finding* irreparable harm, the district court erroneously relied on a *presumption* of irreparable harm in copyright cases, *see, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 532 (6th Cir. 2004), which WIN argues was abrogated by the Supreme Court's decisions in *Winter* and *eBay*.  *See Winter*, 555 U.S. at 22;

*eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 392–94 (2006).   Accordingly, it asks us to formally recognize the presumption's abrogation and remand the case to the district court so that it can find, rather than merely presume, irreparable harm.[7]

We need not reach this issue.   There is no merit to WIN's claim that the district court improperly relied on a presumption of irreparable harm.   To the contrary, the district court explicitly acknowledged the presumption's likely abrogation, and so it independently found irreparable harm.   As the district court remarked,

> The Sixth Circuit has previously recognized that, "[i]n a copyright-infringement action[,] a plaintiff establishes a rebuttable presumption of irreparable harm by demonstrating a likelihood of success on the merits." *Sony/ATV Publishing, LLC v. Marcos*, 651 F. App'x 482, 487 (6th Cir. 2016) (citing *Lexmark*, 387 F.3d at 532–33).   However, more recently, the Court of Appeals recognized that, as other circuits have done away with it, "the rebuttable presumption appears to be on its last legs." *Enchant Christmas*, 958 F.3d at 540 n.3.   Accordingly, while the Court acknowledges that such a presumption may yet exist in this Circuit, *the Court separately finds that ACT will be irreparably harmed if WIN is not enjoined.*

Op. & Order at 24, R. 541 (emphasis added).

And the district court then explained why, in its view, ACT would likely suffer irreparable harm absent an injunction: WIN was "harming ACT's competitive position in the marketplace." *Id.* at 24–25.   Indeed, WIN had "already used the infringing materials to bid on contracts with consumers and compete with ACT." *Id.* at 26.   That history, the court concluded, "suggests that [WIN] will continue harming ACT's reputation, diminishing the perceived value of ACT's intellectual property, and unfairly competing with ACT.   Consequently, ACT has demonstrated irreparable harm." *Id.*   Such interference with customer relationships and damage to reputation are precisely the sorts of injuries this circuit has said are difficult to quantify monetarily, and thus constitute irreparable harm. *See, e.g.*, *Certified Restoration Dry Cleaning*

---

[7]WIN offered a somewhat different version of this critique at oral argument.   Rather than asserting that the district court relied *directly* on a presumption of harm, WIN argued that (1) despite its claimed effort to independently find irreparable harm, the district court made no *satisfactory* finding, as its reasoning on the harm issue was too thin; (2) in the absence of a genuine harm finding, the district court's injunction could only be alternatively sustained via a presumption of irreparable harm; and (3) because no such presumption exists, the injunction cannot be sustained. *See, e.g.*, Recording of Oral Arg. [21-5889] at 8:10–9:34; 11:10–12:37.   We reject this late-arriving syllogism, however, for the same reason we reject its predecessor: the district court independently found irreparable harm, and that finding is not clearly erroneous.

*Network*, *L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007); *see also Basicomputer Corp. v. Scott*, 973 F.2d 507, 511–12 (6th Cir. 1992). Certainly, the district court "did not clearly err" in finding that ACT faces irreparable harm on these bases. *Babler v. Futhey*, 618 F.3d 514, 524 (6th Cir. 2010).

In response, WIN offers a backup argument: Even *if* we believe the district court made independent findings, it found merely that harm was *possible*, rather than likely, as required by Supreme Court precedent. *See Winter*, 555 U.S. at 22. Reading the opinion like a statute, *but see Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979), WIN homes in on the district court's remark that "WIN's history of using ACT's materials *suggests* that it will continue harming ACT's reputation." Op. & Order at 26, R. 541 (emphasis added). And, citing a dictionary, WIN says that a "suggestion" of irreparable harm is tantamount to the mere "possibility" of irreparable harm, which the Supreme Court has explicitly held will not suffice for a preliminary injunction. *See* Appellants' Br. [21-5889] at 22–24; *see also Winter*, 555 U.S. at 22.

We find WIN's contentions here similarly unpersuasive. The district court elsewhere employed just the concrete language that WIN claims is lacking—it found "that ACT *will be* irreparably harmed" and that "ACT has *demonstrated* irreparable harm." Op. & Order at 24, 26, R. 541 (emphases added). The idea that the district court was satisfied with a merely conjectural harm is undercut by these references to an apparent certainty of irreparable harm in the absence of an injunction. Moreover, the district court's irreparable-harm findings were well-supported, given WIN's demonstrated history of likely infringement and its stated desire to continue distributing products that are likely infringing. *See* Appellee's Br. [21-5889] at 65; *Basicomputer Corp.*, 973 F.2d at 512 (affirming a preliminary injunction when "[t]he record contain[ed] ample evidence to support the court's findings" regarding irreparable harm). Once again, we cannot say that on the evidence before it, the district court clearly erred in finding irreparable harm.

### C.   WIN's Contention that the District Court Improperly Gave it the Burden to Prove that an Injunction Was Inconsistent with the Balance of the Equities and Public Interest

WIN last alleges that the district court misapplied both the balance-of-the-equities and public-interest factors by requiring WIN to prove an injunction should *not* issue, rather than forcing ACT to prove an injunction *should* issue. Indeed, WIN claims, the district court "solely evaluated Defendants' contentions regarding why an injunction *would not* be in the public interest and why the equities tip *in Defendants' favor*." Appellants' Br. [21-5889] at 26. In other words, it asserts that the district court improperly shifted the burden onto WIN to establish why an injunction would *not* respect the balance of the equities and accord with the public interest, rather than requiring ACT to establish those showings.

A simple review of the preliminary-injunction opinion, however, reveals that WIN's assertions are meritless. As the district court explained, the balance of the equities tipped in ACT's favor because of "the harm ACT has suffered and will continue to suffer if WIN continues infringing." Op. & Order at 26, R. 541. It then balanced that consideration against WIN's counterargument—that "WIN will likely go out of business" if the court were to issue a preliminary injunction. *Id.* But, as the district court noted, that possibility was simply a consequence of the fact that WIN's business model is to infringe ACT's intellectual property. And, as it pointed out, such "illegal conduct does not merit significant equitable protection." *Id.* (quoting *Disney Enters., Inc. v. VidAngel Inc.*, 869 F.3d 848, 867 (9th Cir. 2017)). So the district court properly weighed the parties' competing interests and reasonably concluded the demonstrated harm to ACT's business outweighed WIN's minimal legitimate interest in continued infringement.

Last, the district court did not err in concluding that the public interest favored a preliminary injunction. Contrary to WIN's claim that it never required ACT to make an affirmative case about why an injunction would serve the public interest, the district court expressly detailed why that was so. "[T]he public has a compelling interest in protecting copyright owners' marketable rights to their work," it said, as well as in protecting "the economic incentive to continue creating." *Id.* at 26 (quoting *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012)). It then balanced that interest against WIN's asserted counter-interest:

that the contracting states of South Carolina, Arizona, Kentucky, and Florida could no longer employ WIN's products.  As the district court pointed out, each of those states has an interest in educational testing, to be sure, but in *legal* testing in compliance with federal copyright law. Moreover, the district court delayed the effective date of its injunction to permit affected states to locate alternative testing suppliers, thus mitigating negative effects on the public from the injunction.  The district court did not abuse its discretion, therefore, in concluding that the public interest favored an injunction.

> D. *WIN's Contention that the District Court's Preliminary Injunction is Overbroad*

WIN's last critique of the injunction is as follows: Assume (as we have just concluded) that the district court justifiably imposed a preliminary injunction.  Even so, WIN says, the *scope* of that injunction is overbroad.  *See* Appellants' Br. [21-5889] at 53–54.  WIN's grievance is that the injunction prevents it from distributing both its Learning Objectives *and* its corresponding assessments testing those Learning Objectives.  But no matter whether the Learning Objectives *themselves* are infringing, WIN argues, the corresponding *assessments* are still lawful, and so their distribution should not have been enjoined.  *See id.*

The district court justified the injunction's scope—that it restrained not only the Learning Objectives but the assessments as well—on the ground that the assessments are "derivative" of the Skill Definitions.  And, true, 17 U.S.C. § 106 gives a copyright holder the exclusive right not only to copy its protected work, but also to prepare "derivative works" based on the same. 17 U.S.C. § 106(2).  Applying that rule, the district court held that the assessments were derivative of ACT's Skill Definitions for two reasons.  First, WIN's assessments test the same skills as ACT chose to test, infringing ACT's skill "selection."  And second, they feature questions that test different skills at skill levels corresponding to the levels in the Skill Definitions, thus infringing ACT's skill "arrangement."

The first rationale, of course, is a non-starter.  As we explained before, ACT lacks copyright protection in its "selection" of the skills—the mere fact that it chose to test Applied Mathematics, Locating Information, and Reading for Information. Protecting the mere decision

to test those fields would be akin to granting a patent to ACT on such a testing system—not a copyright protecting original expression. *But see Baker*, 101 U.S. at 101–02.

As to the "arrangement" rationale, however, we agree with the district court. As we explained above, ACT has a valid compilation copyright in how it chose to arrange the various subskills it tested across its respective skill levels. WIN's assessments, as the district court found, are structured in a closely corresponding manner. Indeed, that is the point of WIN's business model—WIN's mimicry of ACT's skill levels is why a state wishing to test ACT's Skill Definitions might choose to do so with WIN's assessments rather than ACT's. The district court thus correctly held that WIN's assessments were unauthorized derivative works, in that, while they constitute distinct expression, elements of that expression substantially copy protectable elements of ACT's Skill Definitions. *See* 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §§ 3.01, 3.06 (2022). So we affirm the scope of the preliminary injunction as well.

## IV.

We now take up WIN's appeal of the district court's decision to strike the derivative-sovereign-immunity defense from its amended answer. By way of background, we will first describe the theory behind this new defense. As we noted before, states themselves generally enjoy sovereign immunity from suit. *See supra* 7; *see also Puerto Rico Aqueduct & Sewer Auth.*, 506 U.S. at 144. And private contractors may sometimes "obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the [government]"—so-called "derivative sovereign immunity." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016) (quoting *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943)); *see also Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20–21 (1940).

This was the theory WIN wished to assert in its amended answer—that, because it was contracting with various states to supply educational materials, it could assert their immunity from ACT's claims. *See* Am. Answer ¶¶242–44, R. 551. Soon after WIN's addition of that defense, however, ACT moved to strike it. And the district court granted the motion "on two independently sufficient grounds." Appellee's Br. [21-6155] at 25. First, the district court reasoned that defendants raised the defense extremely late in the litigation and gave no

reasonable explanation for the delay.  The district court thus deemed the defense "waived"[8] for its untimeliness. Second, the district court labeled the defense "plainly[ ] frivolous."  Order at 4, R. 605.  As it explained, "[t]he Supreme Court has explicitly rejected a blanket extension of sovereign immunity to persons performing work pursuant to a contract with the Government." *Id.* (citing *Campbell-Ewald Co.*, 577 U.S. at 166).  Rather, the contractor must show that it was following the government's precise specifications or directions when it engaged in the conduct alleged to give rise to liability.  *See, e.g.*, *Yearsley*, 309 U.S. at 20–21; *see also Campbell-Ewald Co.*, 577 U.S. at 167 n.7.  And WIN had shown nothing indicating "that any State government *directed* the infringing activities"—only that it happened to sell states infringing materials of its own design.  Order at 4, R. 605 (emphasis added).  So the district court struck the new defense for also being "frivolous" on the merits.  *Id.*

Because we agree with the district court that WIN's significant delay in asserting the defense resulted in a forfeiture, we need not address whether WIN's defense is frivolous.  So, as we explain below, we affirm the district court's decision on the timeliness ground alone.

As this circuit has held, defendants can forfeit affirmative defenses when they inexplicably delay their assertion of those defenses.  *See Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 750–51 (6th Cir. 2015) (finding a qualified-immunity defense forfeited when defendants failed to plead it in their answer and were "very tardy" in raising it later on); *see also Burton v. Ghosh*, 961 F.3d 960, 966 (7th Cir. 2020) (noting that an "untimely" defense "is forfeited and normally may not be considered by the court" when "the delay prejudices . . . the plaintiff"); 5C Wright & Miller, *supra*, § 1381 nn.14 & 35 (citing cases in which forfeited defenses were stricken).  Indeed, "[w]hen the defendant is unable to offer any reasonable explanation for its tardiness in presenting a defense, finding waiver is not an abuse of discretion." *Henricks*, 782 F.3d at 751.  Rather, we hold, a district court may strike a defense as "insufficient" when, even if it might otherwise have been valid, it is so untimely raised as to be forfeited. *See* Fed. R. Civ. P. 12(f).

---

[8]The district court likely should have said "forfeited," as WIN's behavior was closer to the passive non-assertion of a right than the active relinquishment of it.  *See United States v. Montgomery*, 998 F.3d 693, 697–98 (6th Cir. 2021).

Application of this standard is, to be sure, a fact-bound inquiry, contingent on the circumstances of each case. We thus confront two relevant questions: (1) when could the derivative-sovereign-immunity defense first have been asserted?, and (2) assuming it was long before the filing of the amended answer, did WIN present a reasonable explanation for why it waited until then to raise the defense?

Understanding the first question requires examining the timeline of the litigation. Recall that ACT first filed its complaint asserting its copyright claims in May 2018. WIN filed its answer soon after, in July 2018. It then filed an amended answer in July 2019. The parties do not seem to dispute that a derivative-sovereign-immunity defense, at least practically speaking, was then unavailable.[9] For at that time, the Copyright Remedy Clarification Act of 1990 ("CRCA") purported to abrogate states' sovereign immunity from copyright claims. *See* 17 U.S.C. § 511(a). Assertion of a derivative-sovereign-immunity defense thus would have been futile, as the states themselves were said to enjoy no immunity from which WIN could derive its own.

Then, on March 10, 2020, the district court granted partial summary judgment for ACT on its copyright claims. Thirteen days later, the Supreme Court rendered its decision in *Allen v. Cooper*. 140 S. Ct. at 994. *Allen* deemed invalid 17 U.S.C. § 511(a) of the CRCA, thus clarifying that states may validly assert sovereign-immunity defenses against copyright-infringement claims. *See id.* at 1007. So a derivative-sovereign-immunity defense was likewise available after March 23, 2020. WIN moved the district court to reconsider its partial-summary-judgment order soon after, in April 2020. *See* Mot. to Reconsider, R. 360. But it did *not* do so on the basis of a derivative-sovereign-immunity argument—despite the argument's availability at that point after *Allen* had come down. *See generally id.*

After its loss at partial summary judgment, WIN then employed Burkam to create the revised Learning Objectives. ACT raised its view that the revised Learning Objectives were likewise infringing at the pretrial conference in July 2021. Soon after, the district court entered its *sua sponte* order directing ACT to amend its complaint with new allegations about the revised

---

[9]Technically WIN could have asserted the defense for issue-preservation purposes to argue what became the holding of *Allen*: that Congress did not validly abrogate states' sovereign immunity from copyright claims. But we grant that this defense was unavailable in all practicality until after *Allen*'s decision.

Learning Objectives. ACT did so the next day, on July 30, 2021. WIN answered that amended complaint on August 27, 2021, asserting derivative sovereign immunity for the first time in the litigation. *See* Am. Answer ¶¶242–44, R. 551. Thus, WIN failed to raise the defense until about a year and a half after it became available following *Allen*'s decision. No doubt, then, its assertion of this new defense—after discovery and on the eve of trial—*was* very belated.

The second and more important question is whether WIN has a "reasonable explanation" for why it waited so long to raise the defense. *Henricks*, 782 F.3d at 750–51. WIN claims that it could not have done so until after ACT amended its complaint, because it was only at that point that there was an "active copyright claim" in the suit once more. *See* Reply [21-6155] at 6. Recall how the district court had already entered its partial-summary-judgment order finding that the *original* Learning Objectives were infringing. It was only the new allegations about the *revised* Learning Objectives in the amended complaint, WIN claims, that triggered its ability to assert this new, copyright-related defense. *See id.*

Yet WIN is simply incorrect that it never could have raised the defense until its amended answer. Indeed, as ACT points out, WIN could have moved the district court after its partial-summary-judgment order to reconsider that order based on *Allen* and derivative sovereign immunity.[10] *See* Appellees' Br. [21-6155] at 26. Partial-summary-judgment orders, after all, are not final judgments. They are instead interlocutory, and so may be revised in the district court's discretion until final judgment. *See* Fed. R. Civ. P. 54(b); *see also Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 118 F. App'x 942, 944–46 (6th Cir. 2004). And this circuit has held that new arguments may be raised in motions to reconsider in light of intervening changes in controlling authority. *See, e.g.*, *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009). Despite these points, WIN offers no sufficient explanation for why it failed to raise the derivative-sovereign-immunity defense after *Allen*'s decision in a motion to reconsider the partial-summary-judgment order. *See, e.g.*, Reply [21-6155] at 4–6 (conclusorily labeling ACT's

---

[10] WIN's counsel conceded at oral argument that WIN also could have asked the district court to permit a discretionary amendment to WIN's answer as soon as *Allen* came down, but that WIN failed to do so. *See* Recording of Oral Arg. [21-6155] at 11:11–11:37.

argument "untenable" but failing to explain why WIN did not move for reconsideration under *Allen*).

After all, WIN's amended answer says that WIN was a contractor "*at all times*" relevant to ACT's allegations.  Am. Answer ¶242, R. 551 (emphasis added).  And it was in WIN's response to South Carolina's request for proposal that ACT first noticed the infringing nature of the original Learning Objectives—back in 2017.  *See* Complaint ¶¶66–74, R. 1.  Thus, there was no reason the immunity defense would have been relevant only to the revised Learning Objectives and not the originals.  Rather, to the extent the immunity defense was valid at all, it should have applied "at all times" WIN was contracting with the states—which included WIN's creation of both the revised *and* the original Learning Objectives.  Indeed, counsel for WIN expressly conceded these points at oral argument.  He frankly acknowledged that "the defense would apply the same with respect to both," *see* Recording of Oral Arg. [21-6155] at 9:00–9:15, meaning that there was no specific feature of the revised Learning Objectives that would have made the defense relevant only to them.

Moreover, the filing of the amended complaint did not "wipe the slate clean," as WIN seems to think, and permit it to act as if it were filing an answer for the very first time.  *Burton*, 961 F.3d at 968.  WIN's contrary claim notwithstanding, Rule 8 does not confer an unqualified right to amend an answer with *any* new defense in light of an amended complaint.  Rather, the question is whether addition of the allegations about the revised Learning Objectives somehow "transform[ed] the litigation," or whether, by contrast, they simply embellished allegations about which WIN was already on notice.  *Id.*  True, when an amended complaint *does* "transform the litigation"—as with the addition of a wholly new party or cause of action—it may permit the allegation of novel defenses.  *Id.*  But here, the allegations about the revised Learning Objectives simply note that WIN continued to infringe by creating a modified version of the original Learning Objectives.  In other words, the new allegations are just an extension of the extant allegations—that WIN was infringing ACT's copyrights by copying and distributing its Skill Definitions under the banner of "Learning Objectives."

For those reasons, we affirm the district court's striking of the defense on timeliness grounds.  The defense was equally relevant to both the original and revised Learning Objectives,

Nos. 21-5889/5907/6155    *ACT, Inc. v. Worldwide Interactive Network, Inc., et al.*    Page 24

and it was available long before the filing of the amended complaint. Moreover, WIN could have asserted it at any point in a motion to reconsider the partial-summary-judgment order. We cannot say that the district court abused its discretion, therefore, particularly after discovery had closed and on the eve of trial, in striking WIN's "very tardy," forfeited defense. *See Henricks*, 782 F.3d at 751.

## V.

The district court correctly determined that WIN likely infringed ACT's intellectual property, that the infringement threatened irreparable harm to ACT, and that the balance of the equities and public interest favored an injunction. It likewise properly struck WIN's belated immunity defense. We thus AFFIRM the district court in both respects.

Nos. 21-5889/5907/6155    *ACT, Inc. v. Worldwide Interactive Network, Inc., et al.*    Page 25

---

# APPENDIX A

---

ACT's Side-by-Side Comparison[11] of ACT's Skill Definitions and WIN's Original Learning Objectives for "Reading for Information," Submitted in Response to the 2017 South Carolina RFP. *See* R. 209-1.[12]

| ACT Reading for Information Skill Definitions | WIN Reading for Information Original Learning Objectives |
|---|---|
| **Level 3 Skill Definitions/Learning Objectives** ||
| Identify main ideas and clearly states details | Identify main idea and clearly stated details |
| Choose the correct meaning of a word that is clearly defined in the reading | Choose the correct meaning of a word that is clearly defined in the reading |
| Choose when to perform each step in a short series of steps | Choose when to perform each step in a short series of steps |
| Apply instructions to a situation that is the same as the one in the reading materials | Apply instructions to a situation that is the same as the one in the reading materials |
| **Level 4 Skill Definitions/Learning Objectives** ||
| Identify important details that may not be clearly stated | Identify important details that may not be clearly stated |
| Use the reading material to figure out the meaning of words that are not defined | Use the reading material to figure out the meaning of words that are not defined |
| Choose what to do when changing conditions call for different action (follow directions that include "if-then" statements) | Choose what to do when changing conditions call for a different action (follow directions that contain "if-then" statements) |

---

[11]ACT produced this chart to compare ACT's Skill Definitions and WIN's original Learning Objectives. We have corrected or noted errors in the chart.

[12]The "Locating Information" and "Applied Mathematics" tables are omitted because they are simply duplicative of the point being made: that WIN's original Learning Objectives were identical or near-identical copies of ACT's Skill Definitions.

| Level 5 Skill Definitions/Learning Objectives | |
|---|---|
| Figure out the correct meaning of a word based on how the word is used | Figure out the meaning of a word based on how the word is used |
| Identify the correct meaning of an acronym that is defined in the document | Identify the correct meaning of an acronym that is defined in the document |
| Identify the paraphrased definition of a technical term or jargon that is defined in the document | Identify the paraphrased definition of a technical term or jargon that is defined in the document |
| Apply technical terms and jargon and relate them to stated situations | Apply technical terms and jargon and relate them to stated situations |
| Apply straightforward instructions to a new situation that is similar to the one described in the material | Apply complex instructions that include conditionals to situations described in the materials.[13] |
| Apply complex instructions that include conditionals to situations described in the materials. | Apply complex instructions that include conditionals to situations described in the materials. |

| Level 6 Skill Definitions/Learning Objectives | |
|---|---|
| Identify implied details | Identify implied details |
| Figure out the less common meaning of a word based on the context | Figure out the less common meaning of a word based on context |
| Apply complicated instructions to new situations | Apply complicated instructions to new situations |
| Use technical terms and jargon in new situations | Use technical terms and jargon in new situations |
| Figure out the principles behind policies, rules, and procedures | Figure out the principles behind policies, rules, and procedures |
| Apply general principles from the materials to similar and new situations | Apply general principles from the materials to similar and new situations |
| Explain the rationale behind a procedure, policy, or communication | Explain the rationale behind a procedure, policy, or communication |

---

[13]This entry appears to be an error in the chart that ACT created for the litigation. WIN's subskill, like ACT's, reads: "Apply straightforward instructions to a new situation that is similar to the one described in the material." Joint Appendix at 1395, R. 129-8.

| Level 7 Skill Definitions/Learning Objectives | |
|---|---|
| Figure out the definitions of difficult, uncommon words based on how they are used | Figure out the meaning of difficult, uncommon words based on how they are used |
| Figure out the meaning of jargon or technical terms based on how they are used | Figure out the meaning of jargon or technical terms based on how they are used |
| Figure out the general principles behind the policies and apply them to situations that are quite different from any described in the materials | Figure out the general principles behind policies and apply them to situations that are quite different from any described in the materials |

————————————

## APPENDIX B

————————————

Side-by-Side Comparison of ACT's Skill Definitions and WIN's Revised Learning Objectives for "Reading for Information." *See* R. 534-1.[14]

| ACT Reading for Information Skill Definitions | WIN Reading for Information Revised Learning Objectives |
|---|---|
| **Level 3 Skill Definitions/Learning Objectives** | |
| Identify main ideas and clearly stated details | Identify the paraphrased definition of a word that is defined in the text |
| Choose the correct meaning of a word that is clearly defined in the reading | Identify the meaning of common workplace terms |
| Choose the correct meaning of common, everyday and workplace words | Summarize the main idea and identify explicit details from a directive to employees |
| Choose when to perform each step in a short series of steps | Follow step-by-step instructions for employees and identify the order in which steps should be taken |
| Apply instructions to a situation that is the same as the one in the reading materials | Review instructions presented in a workplace document and apply to another similar situation |
| **Level 4 Skill Definitions/Learning Objectives** | |
| Identify important details that may not be clearly stated | Use contextual clues to determine the meaning of unfamiliar words |
| Use the reading material to figure out the meaning of words that are not defined | Recognize implied details from workplace communications to employees |
| Apply instructions with several steps to a situation that is the same as the situation in the reading materials | Apply multi-step instructions to employees to a scenario that is similar to the one described in the text |
| Choose what to do when changing conditions call for a different action (follow directions that include "if-then" statements) | Apply conditional (if/then) instructions to a situation similar to the situation described in the text |

————————————

[14]The "Locating Information" and "Applied Mathematics" tables are omitted because they are also duplicative of the point being made: that WIN's revised Learning Objectives were also near-identical copies of ACT's Skill Definitions.

Nos. 21-5889/5907/6155    *ACT, Inc. v. Worldwide Interactive Network, Inc., et al.*    Page 29

| Level 5 Skill Definitions/Learning Objectives ||
|---|---|
| Figure out the correct meaning of a word based on how the word is used | Use contextual clues to determine the meaning of unfamiliar words |
| Identify the correct meaning of an acronym that is defined in the document | Select the meaning of a workplace acronym or initialism that is defined in the text |
| Identify the paraphrased definition of a technical term or jargon that is defined in the document | Recognize the paraphrased definition of workplace jargon or technical terms defined in the text |
| Apply technical terms and jargon and relate them to stated situations | Use technical terms and jargon to describe the scenario in the text |
| Apply straightforward instructions to a new situation that is similar to the one described in the material | Review instructions presented in a workplace document and apply to a different situation |
| Apply complex instructions that include conditionals to situations described in the materials | Relate complex conditional (if/then) instructions to situations similar to the situations described in the text |
| Level 6 Skill Definitions/Learning Objectives ||
| Identify implied details | Use contextual clues to determine the meaning of unfamiliar words |
| Use technical terms and jargon in new situations | Identify implied details from complex workplace instructions or articles |
| Figure out the less common meaning of a word based on context | Apply workplace technical terms and jargon to different scenarios |
| Apply complicated instructions to new situations | Relate complicated instructions to different situations |
| Figure out the principles behind policies, rules, and procedures | Relate general principles from the text to similar and new situations |
| Apply general principles from the materials to similar and new situations | Determine the unstated rational [*sic*] or principle behind a workplace policy, rule, procedure, or communication |
| Explain the rationale behind a procedure, policy, or communication | |

| Level 7 Skill Definitions/Learning Objectives | |
|---|---|
| Figure out the definitions of difficult, uncommon words based on how they are used | Use contextual clues to determine the meaning of very difficult words |
| Figure out the meaning of jargon or technical terms based on how they are used | Use contextual clues to determine the meaning of workplace jargon and technical terms |
| Figure out the general principles behind the policies and apply them to situations that are quite different from any described in the materials | Relate unstated reasoning behind complex workplace policies to situations that are different from those described in the text |

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 21-5889/5907/6155

```
┌─────────────────────────────┐
│          FILED              │
│       Aug 23, 2022          │
│   DEBORAH S. HUNT, Clerk    │
└─────────────────────────────┘
```

ACT, INC.,

     Plaintiff - Appellee,

     v.

WORLDWIDE INTERACTIVE NETWORK, INC.; TERESA
CHASTEEN,

     Defendants - Appellants.

Before:  WHITE, BUSH, and READLER, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgments of the district court are AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk